Rupnik *v.* Pennsylvania Railroad Company,
Appellant.

Argued September 30, 1963. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*William Claney Smith*, with him *Lisle A. Zehner*, and *Smith & Zehner*, for appellant.

*Robert B. Ivory*, with him *Evans, Ivory & Evans*, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, November 12, 1963:

The plaintiff in this case, John J. Rupnik, employee of the Pennsylvania Railroad Company, sued the Railroad Company under the provisions of the Federal Employers' Liability Act* and recovered a verdict in the sum of $50,000. The defendant has moved for judgment n.o.v. and for a new trial. The facts briefly are as follows.

On May 1, 1957, John Rupnik, working as a riveter on the Superior Avenue Bridge which crosses Pennsylvania Railroad tracks in Pittsburgh, was engaged in installing new plates under the "walk brackets" of the

---

* 45 U.S.C.A. §51 et seq., Note 1310.

45 U.S.C.A.—"injury . . . by reason of any defect or insufficiency, due to its negligence, in its [the common carrier's] appliances, machinery . . . works . . . or other equipment."

bridge. In order to accomplish this operation he had to lie on a scaffold suspended beneath the bridge and hold his 18-inch riveting gun above him, flattening the rivets which were inserted into the appropriate holes. The scaffold from which he worked measured about six feet by six feet and was suspended by 3/8" cables. The space between the floor of the scaffold and the surface on which Rupnik was engaged measured only 18" to 24". This restricted space required him to use his left hand to hold on to the bridge structure, while, with his right hand he extended the riveting gun away from the scaffold and out into the free air so that he could get the proper leverage to trigger the gun. In this spatial and unsupported position he pressed the gun against the rivets, pounding them into submission and permanent heading.

The riveting gun weighed about 10 pounds and operated with a compressed air pressure of 100 pounds. Considering the recoil inherent in such a pneumatic tool, the unyielding quality of the metal against which it pounded, and the force required to hold the gun in place, the plaintiff's riveting arm was subjected to a muscular exertion which severely strained all anatomical ligaments involved.

While performing this operation, Rupnik suddenly felt a pain in his right shoulder with stiffness in his neck and upper back. That evening he was examined by Dr. Glenn Roberts, an osteopath, who diagnosed his condition as "a myofascitis . . . from the injury to a nerve root, myofascitis of the musculature . . . a nerve damage in the lower cervical, upper dorsal area." Rupnik was also examined and treated by the railroad doctor.

Rupnik went on vacation immediately after the accident and then returned to work other than riveting. At times he was furloughed because of slack employment. During these furloughs he tried other jobs but

was unable to remain at them for any appreciable period of time because of the pain in his shoulder. After the accident he tried one day to operate a jackhammer (an automatic tool used in digging up concrete) but after a five minutes' effort he had to abandon it because of the pain it provoked in his shoulder.

Dr. Roberts testified that at the time of the trial the plaintiff still had "spasm of the musculature; he has a nerve root syndrome," that he was wearing a support for a low back and that he suffered "great pain." He said that the plaintiff's condition would get worse and that in a period of from 5 to 10 years he would be physically incapacitated to work on the railroad.

The appellant contends that it is entitled to judgment n.o.v. on the basis that the plaintiff did not meet his burden of establishing negligence on the part of the railroad to furnish the employee with a reasonably safe place to work. The scaffold on which the plaintiff was compelled to lie as he worked was, as heretofore indicated, suspended from the bridge by $\frac{3}{8}''$ wire, flexible cables which allowed it to sway with the movement of the worker on it. Rupnik operated, as also already stated, in a space less than two feet deep. In this cramped, constructing area and on this oscillating platform, he was compelled to maneuver his heavy riveting gun out in the void. Having nothing on which to rest shoulder, elbow, or wrist the plaintiff found himself holding his ponderous weapon in midair as it jolted against the metal overhead. This could hardly be called a safe place and manner in which to work. Nor did the exigencies or locale of the situation compel so hazardous a working method. Prior to May 1, 1957, Rupnik worked from a platform suspended beneath the bridge by rigid, unyielding rods some 7 or 8 feet long, so that he had ample space in which to wield his tools and he could work standing or sitting as he best saw fit.

Rupnik had complained to his foreman about the close-fitting, swaying platform, but nothing was done to correct the situation, the reason being that the deeper hanging platform required its being raised once or twice a day to permit trains to pass underneath. Raising such a platform would have consumed four or five minutes at a time. Such a circumstance could not excuse a railroad from its duty to provide its employees with a safe place in which to work. No expediency of travel or economy can justify the unnecessary jeopardizing of life or limb of a workman. The failure of the railroad company to provide Rupnik with a safe working environment constituted negligence under the law. The motion for judgment n.o.v. was thus properly denied in the court below.

The defendant submits that, failing to obtain judgment n.o.v., it is entitled to a new trial on several grounds. It states that the Trial Judge improperly refused to charge the jury that the failure of the plaintiff to call two doctors who had treated him was to be interpreted as meaning that had those doctors testified their testimony would have been adverse to the plaintiff. This contention compels some background explanation. Rupnik was under Dr. Roberts' care throughout the entire period between the date of the accident and the date of the trial. During this period Dr. Roberts treated him some 50 or 60 times. Dr. Johnston, another physician, testified that he examined the plaintiff on February 8, 1959, which was about 21 months after the accident and that from his medical examination, plus the history of the case, in addition to x-ray pictures which were taken, he was able to say that the plaintiff's disability was caused by the accident of May 1, 1957.

It appears that the plaintiff suffered much pain for a considerable period of time following the accident and that in the words of the Trial Judge, "in despera-

tion" he called one day on a Doctor Hughey who referred him to a Dr. Kuehner, an orthopedist, who put him in the Mercy Hospital to test his spine by a procedure known as a "myelogram" and to prescribe for him some orthopedic devices. Neither Dr. Hughey nor Dr. Kuehner testified at the trial. In his brief, defendant's counsel complains more about the plaintiff's failure to call Dr. Kuehner than the failure to call Dr. Hughey.

On the day after the accident Rupnik was examined by Dr. L. W. Dibert, the defendant's regional medical doctor. Later, Dr. Dibert sent the plaintiff to an independent specialist named Dr. Samuel Sherman. Both these doctors testified at the trial. All in all, 14 physicians examined or treated the plaintiff, ten of them being employees of the defendant. Both sides wisely refrained from summoning all these doctors to the trial which otherwise might have taken on the appearance of a medical convention.

Four doctors were enough to acquaint the jury with the professional medical aspects of this case. The plaintiff himself testified at length and in detail as to his sufferings, the treatment he had received, and the therapeutic equipment he was required to use. There was no gap left to guesswork in the whole span of the plaintiff's history of his injury and disablement.

It is a mistaken impression that a plaintiff's injuries and disabilities must be described in professional technical language. Who would know better what happened to an individual than he himself, excluding moments of unconsciousness, which is not involved here?

The plaintiff told of his hospitalization, the care he had received from physicians, and the traction halter, cervical collar and back brace he was required to wear. He produced this equipment in court for the jury to see. He related the difficulties he experienced,

the handicaps he encountered, his attempts to obtain other employment when he was on furlough from the railroad. His narrative needed no underslung technical riveting to uphold the bridge of clarity, substance and credibility over which it traveled. The Trial Judge said of him: "The trial judge and writer of this opinion was favorably impressed by the conduct of a man who kept trying to help himself while working."

The refusal of the Trial Court to tell the jury they might draw unfavorable inferences because of the absence of two of the plaintiff's doctors was a matter of discretion which, the record reveals to us, was not abused. The defendant cites the familiar rule that: "Where evidence which would properly be part of a case is *within the control* of the party whose interest it would naturally be to produce it, and without satisfactory explanation, he fails to do so, the jury may draw an inference that it would be unfavorable to him." *Hall v. Vanderpool*, 156 Pa. 152. (Emphasis supplied.)

There was no evidence that the evidence of Dr. Kuehner was "within the control of the party whose interest it would naturally be to produce it." On the contrary, as stated by the Trial Court: "It would have been contrary to the truth known to the trial judge to have suggested the possibility that Doctor Kuehner was even slightly within the control of either party or that he was not equally available to both."

The defendant also complains because the Trial Judge refused to affirm its points 6 and 7, which had to do with the alleged noncausal relationship between the plaintiff's hospitalization and treatment, and his injury. We approve of the lower Court's disposition of this contention: "Points six and seven are extremely argumentative and do not correctly reflect the evidence. There is no doubt whatsoever that plaintiff was in the Mercy Hospital because of the injury involved in this case, and this is a fact which was accepted by defendant's principal medical expert."

While plaintiff's counsel was summing up his case to the jury, defendant's counsel objected to certain remarks and moved for the withdrawal of a juror. The record would indicate that this incident, which is not an unusual one in any vigorously contested trial, did not assume the proportions argued by defendant's counsel, and we agree with the Trial Court: "Nothing had been said which was entirely beyond the scope of the evidence or possible inferences therefrom. The incident involved only the usual forensic by-play between counsel which was more diverting than important as we see it."

Dr. Divert testified that his diagnosis showed that the plaintiff had had a bursitis prior to the injury of May 1, 1957. The plaintiff denied this. Because of this, defendant's counsel wanted the judge to charge the jury that if the plaintiff "testified falsely" on the bursitis matter, they could "disregard and disbelieve all his testimony concerning how the injury occurred, and the nature of the injury and the extent of his disability." The Court disposed of this complaint with dispatch, clarity and accuracy when it said: "The rule of law embraced in point five was included in the part of the charge which covered credibility of the witness. Furthermore, it would have been improper to instruct the jury in the argumentative words of this point as submitted."

Finally, the defendant contends that the verdict was excessive and contrary to the weight of the evidence. The plaintiff was injured on May 1, 1957, because of the riveting episode described. He put away his riveting gun and has not used it since, although he has done some railroad work. Up to the time of the trial he had lost 108 days' work.

Having left school at the end of the seventh grade, he is not educationally equipped to perform work other than that which depends principally upon physical effort and stamina. He manages to exert himself but his

right shoulder and network of muscles and ligature working in cooperation therewith have been damaged to the extent that no improvement can be expected. When asked whether working on the railroad would be harmful to the plaintiff, Dr. Johnston testified: "He may get a completely ruptured disc at any time, particularly in the lumbar region with that type of back; those backs are asymptomatic."

Also: "He has an unstable neck and back. Unstable neck and back patients are asymptomatic practically all their lives, especially if they do any type of work that requires lifting, head turning and bending."

Dr. Roberts saw progressive deterioration in the plaintiff's disablement and professionally predicted as stated above that the plaintiff "will be disabled in from five to ten years." The plaintiff was only 34 years of age at the time of the trial. This would mean that at 44 years of age at the latest, he would be permanently disabled for railroad work. The railroad admits that there is no compulsory retirement for men in Rupnik's classification. Thus, it is obvious that in the usual span of life of a healthy man, there would be bound to be at least 15 years ahead of the plaintiff when he would be able to work but which, on account of his disablement, will now be empty of pay checks. Since he was earning some $4500 a year prior to the accident, it would not appear that $50,000 for impairment of earning power, loss of wages, pain and suffering, and medical expenses, is excessive. The lower Court said on this subject: "If the verdict had been twice the amount it would be difficult to disturb it."

We cannot say from the record that our conscience could or should be shocked at one-half of what the Trial Court thought would be adequate, proper and just.

Judgment affirmed.

Mr. Justice BENJAMIN R. JONES dissents and would enter judgment n.o.v.