Downey, Appellant, *v.* Weston.

Argued November 12, 1971. Before JONES, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Thomas J. Burke,* with him *Haws & Burke,* for appellant.

*Norman Paul Harvey* and *Francis Recchuiti,* with them *James N. Peck* and *John F. Naulty,* for appellees.

OPINION BY MR. JUSTICE POMEROY, March 16, 1973:

On March 30, 1965, the plaintiff-appellant, Edward F. Downey, was involved in an automobile accident with cars driven by defendants Elva Weston and Samuel M. Edelson. In July of 1967 appellant brought this action in trespass against defendants in Montgomery County. The matter was tried to a jury over a period of eight days and a verdict was returned for plaintiff in the amount of $15,455. Unsatisfied with that figure, plaintiff filed a motion for new trial which was denied by the court below. From the judgment entered following that denial the plaintiff brings this appeal.[1]

Following the accident in March, 1965, appellant Downey returned to his work as a milkman. Some months later Downey began to experience pain in his neck and shoulders, pain which soon radiated to his legs. Within a year after the accident, appellant began to lose strength in his arms and legs and experienced difficulty in performing his daily task of milk delivery. On November 4, 1967 Downey suffered a fall at work that precipitated his early retirement from employment. Subsequently appellant's condition was diagnosed as amyotrophic lateral sclerosis (sometimes herein "ALS"), a relatively rare neurological disorder characterized by progressive deterioration and death of nerve cells located in the spinal column. As the nerve cells die, muscular stimulation is impeded and ultimately

---

[1] The appeal is in this Court under the Act of June 24, 1895, P. L. 212, §7(c), as amended, Act of August 14, 1963, P. L. 819, §1, 17 P.S. §184, placing appellate jurisdiction in actions at law in this Court where the amount in controversy exceeded $10,000. That statute was repealed by the Appellate Court Jurisdiction Act, Act of July 31, 1970, P. L. 673, art. V, §509(a)(1), 17 P.S. §211.509 (a)(1) (Supp. 1972-73), and under that Act jurisdiction over this appeal would lie in the Superior Court without regard to amount in controversy. The Appellate Court Jurisdiction Act, however, did not become effective until September 11, 1970, after this appeal was docketed.

blocked altogether; atrophy and paralysis ensue. At the time of trial, appellant was almost totally paralyzed and had a life expectancy of four years.

The chief issue at trial was that of causation, i.e., whether Downey's amyotrophic lateral sclerosis was caused by the trauma he received in the automobile collision with defendants. Plaintiff produced medical experts who testified to their belief that trauma can and in this case did cause the disease. Defendants on the other hand produced experts whose opinion it was that trauma is not a causative factor in the onset of the disease. It is appellant's theory on this appeal (shared by appellees) that "[i]n returning its verdict of $15,000, the jury obviously was compensating Mr. Downey only for injuries other than his condition of mixed amyotrophic lateral sclerosis. The jury did not accept the contention . . . that plaintiff's condition . . . was caused by the trauma involved in the accident of March 30, 1965."[2]

Appellant, although the verdict winner, has appealed, alleging as grounds for reversal and for grant of a new trial a number of errors which he claims prejudicially affected the jury's consideration of either the question of causation or the question of damages. We discuss these contentions seriatim and, finding none which requires a new trial, we will affirm the judgment entered below.

## I.

Appellant first alleges that the trial court committed reversible error in restricting cross-examination of a Dr. Brady, one of the defendants' expert witnesses. It appeared that a Dr. Bonner, who was the physician whom Downey first consulted following the auto accident and who also testified on his behalf at trial, had

---

[2] Appellant's Brief at 8.

referred plaintiff to Dr. Brady, a specialist in neurological medicine. When called to the witness stand by defendant Edelson, Dr. Brady stated that it was his opinion that Downey suffered from amytrophic lateral sclerosis and that the disease was not caused by the trauma received by Downey in the automobile accident.

On cross-examination plaintiff's counsel drew out the existence of a close social and professional relationship between Dr. Brady and the lawyer for the co-defendant Weston. The doctor admitted that he had spoken in the living room of his home with that attorney on the eve of the trial and had allowed him to examine a medical file compiled during Downey's earlier consultation in Dr. Brady's office. With that much established, plaintiff's counsel then undertook to show by further cross-examination of Dr. Brady that such pretrial disclosure of plaintiff's medical records without Downey's permission and out of his presence violated the Hippocratic Oath and the Principles of Medical Ethics of the American Medical Association.[3] After objection by defense counsel, however, the court barred this line of cross-examination.

The purpose of all impeachment, of course, is to affect the credibility of the witness. It is beyond question that the interest in or bias of a witness towards either side of a lawsuit may be exposed upon cross-examination, *Price v. Yellow Cab Co.*, 443 Pa. 56, 278 A. 2d 161 (1971), and that in some instances the blocking of such a line of attack may constitute reversible error. *Commonwealth v. Cheatham*, 429 Pa. 198, 239 A. 2d 293 ( 1968). The trial court does, how-

---

[3] There is no dispute that under the Act of June 7, 1907, P. L. 462, §1, 28 P.S. §328, Dr. Brady could have been and was subject to judicial compulsion in revealing the same information about Downey's condition at trial. In light of our disposition in the text, it is unnecessary to reach the question of pretrial, informal disclosure of the medical records involved here.

ever, have discretion in determining the point at which further cross-examination would be unproductive and its ruling will not be reversed save for abuse of discretion. *Grzywacz v. Meszaros,* 417 Pa. 51, 208 A. 2d 237 (1965); *Berkley v. Jeannette,* 373 Pa. 376, 96 A. 2d 118 (1953). A physician's personal friendship with a party or a party's attorney can, of course, be shown. *Grutski v. Kline,* 352 Pa. 401, 43 A. 2d 142 (1945). Cf. *Goodis v. Gimbel Bros.,* 420 Pa. 439, 218 A. 2d 574 (1966). We think that plaintiff sufficiently established the fact of a personal relationship between Dr. Brady and one of defense counsel.

The line of questioning barred by the court below was directed towards establishing that Dr. Brady had misconducted himself (by failure to observe a principle of medical ethics) and that he was, by inference, less likely to be a credible witness than otherwise. It is true that evidence of *some* misconduct or *some* past events throwing light on human character is admissible on cross-examination, but this is restricted to evidence which bears directly on the witness' "character for truth". 3A Wigmore, Evidence §922, at 726 (Chadbourn rev. 1970). Thus we have held inadmissible as being irrelevant to establishing a witness' credibility the fact that he operated an illegal bar and quarreled with his spouse, *Commonwealth v. Gates,* 392 Pa. 557, 141 A. 2d 219 (1958); the fact that he drove an auto recklessly, *Gregg v. Fisher,* 377 Pa. 445, 105 A. 2d 105 (1954); the fact that he had been convicted of assault and battery, *Commonwealth v. Kostan,* 349 Pa. 560, 37 A. 2d 606 (1944); the fact that he had once been a panderer, *McIntosh v. Pittsburgh Railways Co.,* 432 Pa. 123, 247 A. 2d 467 (1968). Similarly, the connection between an alleged breach of a canon of medical ethics and the credibility of the physician on the witness stand is tenuous at most. Its further pursuit here would have been to engage in a collateral inquiry of dubious rele-

vance. We are satisfied that the trial court committed neither abuse of discretion nor error of law in closing this line of inquiry.

## II.

Appellant next argues that the court below erred in giving the "diluted" instruction, set forth in the margin,[4] relative to defendant's failure to call a Dr. Groff, who had examined the plaintiff at defendants' request.

There is no dispute that appellant in fact suffered from the debilitating effects of ALS at the time he was examined in December, 1969 by Dr. Groff. The issue in the case, as appellant points out, was one of causation: did or did not appellant's sclerosis result from the trauma he had sustained? In support of this theory that it did, appellant produced the testimony of three medical experts. In opposition to that theory, the defense likewise called three medical experts. In all, the record contains hundreds of pages of testimony by these six expert witnesses, virtually all of which is devoted to the question of causation and all of which conclusively demonstrates but one fact: the best minds of medical

---

[4] The trial court gave the following instruction (the first paragraph was one of appellant's requested points for charge; it is the second paragraph that appellant finds objectionable):

"On December 1, 1969, the plaintiff was examined in the office of Dr. Robert A. Groff, on behalf of the defendant Elva Weston, and the failure of the defendant Weston to produce the evidence of such examination by Dr. Groff without satisfactory explanation, permits you, as members of the jury, to draw an inference that if such evidence was produced it would be unfavorable to the defendant Weston.

"I approve that point, members of the jury, but in this case as in every other case, the plaintiff has the power to subpoena, and if the plaintiff thinks any witness will be beneficial to him or her, the plaintiff has the legal right to subpoena that witness and require that witness to come into Court and testify in his behalf."

science are nowise in agreement as to the etiology of amyotrophic lateral sclerosis.

The general principle which appellant here invokes is well stated in Wigmore: "The failure to bring before the tribunal some circumstance, document, or witness, when either the party himself or his opponent claims that the facts would thereby be elucidated, serves to indicate, as the most natural inference, that the party *fears to do so,* and *this fear* is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party. These inferences, to be sure, cannot fairly be made except upon certain conditions; and they are always open to explanation by circumstances which make some . . . hypothesis [other than fear] a more natural one. . . ." 2 Wigmore, Evidence §285, at 162 (1940 ed.) (emphasis added). Two such circumstances which have long been recognized as negating the inference of the non-calling party's fear of adverse testimony are (1) availability of the non-testifying witness to the other party, *Bentivoglio v. Ralston,* 447 Pa. 24, 29, 288 A. 2d 745 (1972); *Haas v. Kasnot,* 377 Pa. 440, 105 A. 2d 74 (1954); *Rice v. Hill,* 315 Pa. 166, 172 A. 289 (1934), and (2) the likelihood that the testimony of the non-called witness would be "unimportant or cumulative or inferior to what is already utilized." 2 Wigmore, Evidence §287, at 168 (1940 ed.); *Commonwealth v. Tauza,* 300 Pa. 375, 150 A. 649 (1930). We find both circumstances present in this case and we are therefore of a view that no instruction, diluted or undiluted, need have been given concerning the failure of the defense to call Dr. Groff.

As to the first circumstance it is apparent that the appellant knew of the existence of Dr. Groff and of the fact that appellant had been examined by the doctor at defendants' request. There is no indication that the whereabouts of Dr. Groff were unknown, that he would have denied a request to testify for appellant, or that he

would have proved to be hostile or uncooperative. In *Rupnik v. Pennsylvania R. R. Co.*, 412 Pa. 460, 194 A. 2d 906 (1963), we held that, absent a showing of the witness' unavailability to the defendant, no inference could be taken against a plaintiff who failed to call to the stand one of the two physicians who examined him at his request. We think *Rupnik* clearly controls this case.

As to the second circumstance referred to above, we note that on the issue of causation of this kind of sclerosis by trauma appellees had produced notable medical authorities.[5] Absent a showing or offer to show that the missing Dr. Groff was an authority on the etiology of this disease on a par with or greater than the authorities who had been called by the defendants, it is a likely hypothesis that defendant failed to call Dr. Groff because his testimony would be either cumulative or inferior.[6]

---

[5] For example, one of defendants' experts, Dr. Kurland, was the Chairman of the Department of Medical Statistics, Epidemiology and Population Genetics of the Mayo Clinic and a professor of epidemiology at the Mayo Graduate School of Medicine. Dr. Kurland had in the past undertaken extensive studies in Guam and other Western Pacific areas to determine the incidence and etiology of amyotrophic lateral sclerosis and had written on the subject on several occasions.

[6] After the close of defendants' case and in an effort to qualify for an adverse inference instruction on the defense's failure to put Dr. Groff on the stand, appellant offered to prove through a Dr. Bonner that Dr. Groff in fact possessed qualifications sufficient to have enabled him to testify on the question of causation. That offer was rejected. We do not read the discussion at sidebar, however, as an offer to prove that Dr. Groff was preeminent in the field of causation of this type of sclerosis. As indicated in the text, we think that given the testimony of six physicians already in the record, a meaningful inference could be drawn only from a failure to offer the testimony of a recognized authority in the field and not merely from the failure to offer the testimony of another doctor.

In sum, there was present here a difficult and unsettled scientific question as to which six medical doctors had already testified. The probative value of the inference arising from the non-calling of Dr. Groff was weak indeed. We are satisfied that the instruction in footnote 4 gave appellant all the benefit concerning it to which he was entitled.

### III.

Following the conclusion of defendants' case, appellant sought to call in rebuttal one of its medical experts, a Dr. Wycis, who had testified during the plaintiff's case in chief. All of the defense medical witnesses had stated that based on the information now available to medical science, it was unlikely that trauma—physical injury to living tissue—could cause the onset of amyotrophic lateral sclerosis, a disease involving the selective degeneration and death of only the lower motor neurones of the anterior horn cells located in the spinal cord. Plaintiff offered to prove in rebuttal through Dr. Wycis that such selective destruction of the anterior horn cells can be caused by trauma. The trial court was of the view that this offer was merely an attempt to prove a point which had already been covered in great detail by this same witness as part of plaintiff's case in chief, but it nevertheless permitted Dr. Wycis to be recalled. In so doing, however, the court restricted the witness to a statement that the disease could be caused by trauma and that trauma would cause the selective destruction of only one type of nerve cell in the spine. Plaintiff alleges error in this limitation.

It is an elementary proposition that the plaintiff must prove during his case in chief all essential elements of his action as to which he has the burden of proof, and that he may not as a matter of right introduce evidence in rebuttal which is properly part of his

case in chief. *Murphy v. Philadelphia,* 420 Pa. 490, 218 A. 2d 323 (1966); *Jarvis v. Bell,* 296 Pa. 568, 146 A. 153 (1929). Laub, Penna. Trial Guide §116, at 248. The trial court has discretion in excluding as rebuttal evidence that which is properly part of the case in chief. *Flowers v. Green,* 420 Pa. 481, 218 A. 2d 219 (1966); *Potochnik v. Pittsburgh Rys. Co.,* 379 Pa. 154, 108 A. 2d 733 (1954). See also *Llewellyn v. Duquesne Light Co.,* 273 Pa. 17, 116 A. 530 (1922).

It is apparent that here appellant sought on rebuttal merely to restate and elaborate his theory of causation, an element that it was his obligation to prove affirmatively during his case in chief. We therefore find the action of the trial court in permitting appellant's medical witness to restate, albeit in limited form, his theory of causation to have been generous in the circumstances; no error or abuse of discretion was committed in the limitation of rebuttal scope.[7]

## IV.

During the cross-examination of one of defendants' expert medical witnesses, a Dr. Rupp, plaintiff's counsel asked the witness whether the Journal of Nervous and Mental Disease was a reputable periodical in the field of neurology. The witness replied that it was. Plain-

---

[7] Appellant cites *Frankel v. Styer,* 386 F. 2d 151 (3d Cir. 1967), as authority to the contrary. We find it not in point. In that case plaintiff's medical expert was unavoidably delayed by a snowstorm and the court permitted plaintiff in the witness' absence to introduce that physician's official report of cause of death which stated, without elaboration, "suffocation". Defendant produced an expert who testified that the death was caused by an arteriosclerotic heart condition. Plaintiff then sought on rebuttal to call his witness, now arrived at trial, to explain the bare statement of "suffocation". The lower court denied the offered rebuttal and was reversed on appeal. Dr. Wycis, unlike the physician in *Frankel,* was present during the case in chief and testified at great length.

tiff's counsel then cross-examined Dr. Rupp (and all other defense experts as well) on the conflict between his opinion that somatic trauma is not a causative factor in the onset of ALS and a contrary opinion set forth in an article by one Dr. Jelliffe published in that journal in 1935 and first presented as a paper before a meeting of the American Neurological Association.[8] With regard to this latter organization, plaintiffs' counsel asked the witness, a doctor of medicine: "Is this the equivalent of the American Bar Association for lawyers?" The witness replied, "It is an association of neurologists." At this point the trial judge interjected, "You get some weird speeches before the American Bar Association." Plaintiff's counsel immediately objected and the judge thereupon directed this his remark be stricken from the record. This comment is assigned as reversible error.

The plaintiff below was, of course, entitled to a trial before an impartial jury uninfluenced by the court's having shown favoritism or ill-temper towards either side. *Haymarket Building & Loan Ass'n v. Smigelsky,* 321 Pa. 337, 183 A. 2d 802 (1936); *Welsbach Street Lighting Co. v. City of Philadelphia,* 318 Pa. 166, 178 A. 126 (1935). While the trial judge has a certain latitude in making remarks during the course of the proceedings, *Lester v. Century Indemnity Co.,* 356 Pa. 15, 50 A. 2d 678 (1947), uncalled for remarks made in ill-chosen language are prejudicial and can be the occasion for awarding a new trial. *Taylor v. Urban Redevelopment Authority,* 419 Pa. 430, 214 A. 2d 623 (1965); *DiBona v. Philadelphia Transportation Co.,* 356 Pa. 204, 51 A. 2d 768 (1947). While the judge here was undoubtedly being facetious in this reference to the professional organization of which he as a lawyer and a

---

[8] S. E. Jelliffe, 82 Journal of Nervous and Mental Disease, 414 (1935).

judge had personal knowledge, the comment in question was out of place and would have been better left unsaid. This humorous reference to bar association speeches (the parties here agree that the comment drew courtroom laughter) was perhaps susceptible of being misunderstood as belittling the neurological association. We think, however, that appellant's claim of prejudice resulting from this comment is unrealistic.

Trial of this case occupied eight days; the transcript encompasses 1091 typewritten pages of testimony. Other than the brief and immediately stricken comment of which appellant complains, the record shows that the court conducted the trial in a most evenhanded and impartial manner. We cannot believe that jurors, after eight days of testimony, would be impermissibly influenced by the short, isolated comment of the court. We think it fair to say that the jury would understand that the trial court possessed no special knowledge of the subject of causation of sclerosis and would in turn understand that the comment, tending as it did to belittle not only a medical organization but the professional organization of which the judge was likely a member, was humorous only. We see no prejudice.

## V.

At trial an employee of Abbott Dairies (plaintiff's employer until his retirement in November, 1967) testified for appellees as to the medical history of Mr. Downey as shown by dispensary records of that company. A Dr. O'Neill, plaintiff's personal physician since 1959, also testified and recounted the substance of every visit to his offices by Downey since that year. Appellant here contends that the testimony of these two witnesses related only "various minor and unconnected accidents" and "various and sundry colds and respiratory infections", that these incidents were too remote

or otherwise lacked probative value, and were therefore improperly admitted.

During appellant's case in chief he called the following witnesses with respect to the state of his health prior to the date of the automobile accident in 1965: his wife ("in very good health"); Downey himself ("no problems whatsoever" and "had no problems at all"); Downey's brother ("[H]e was always in good shape and was able to move around real well and do anything in the period involved"). None of these witnesses mentioned *any* past health problem at all. Manifestly it was open to the appellees to contradict, if they could, the impression of perfect health thus given. *Harriett v. Ballas,* 383 Pa. 124, 117 A. 2d 693 (1955); *Bunting v. Hogsett,* 139 Pa. 363, 21 A. 33 (1891); *McKean v. S. S. Kresge Co.,* 195 Pa. Superior Ct. 236, 171 A. 2d 582 (1961); 22 Am. Jur. 2d, *Damages* §95, at 139 (1965). No error was committed in permitting the defendants to show that in the six-year period preceding the date of the accident, the plaintiff complained to his doctor of pain around the scapula, cramps and chest pains, tiredness, sacroiliac disease, and related a history of an ulcer. It is true that a sizeable portion of Dr. O'Neill's testimony related to "various and sundry colds and respiratory infections." Plaintiff, however, had stated that he had had "no [health] problems whatsoever." We cannot say as a matter of law that the verity of a statement so sweeping is not affected by proof that the person making it has in fact been afflicted with the "various and sundry colds" of the ordinary person.

Defendants contended, and the lower court agreed, that plaintiff's theory of causation as between trauma and ALS had made relevant Downey's entire past history of falls and mishaps, and it was for that purpose that the dispensary record of Abbott Dairies was allowed in evidence. This showed, *inter alia,* a fall in 1935, one in 1936, one in 1938, a blow to the back in

1939, a back strain in 1950 while loading a milk truck, a fall in 1955, and an ankle sprain in 1960. While, like the testimony of Dr. O'Neill, the dispensary record does contain some rather trivial matter (e.g., "cut finger on broken bottle"), we cannot say that such items, scattered throughout a record containing many relevant entries, were prejudicial to plaintiff's case. The jurors were as likely as appellant to identify and discount the episodes that were trivial.

## VI.

The final allegation of error relates to reference at trial to Downey's receipt of workmen's compensation benefits because of a disability commencing November 4, 1967, with a fall at work and terminating in February, 1968, four months later. Defendants had a twofold purpose in introducing evidence of this fall in 1967. First, they sought to show that Downey had suffered a trauma over two years *after* the date of the automobile accident in which defendants were involved; second, they sought to show that Downey himself at the time attributed the fall to "wet leaves" and not to the earlier automobile accident and that he had filed a claim for workmen's compensation. All parties, the court included, were evidently in agreement that while it was arguable that the *application* for such benefits might be relevant as an admission of the plaintiff, the *receipt* of such benefits would be inadmissible as a violation of our decision in *Boudwin v. Yellow Cab Co.*, 410 Pa. 31, 188 A. 2d 259 (1963). Nonetheless, the testimony at trial with regard to the subject of workmen's compensation was as follows: "Q. As a result of that [fall] was this accident reported to any Workmen's Compensation? . . . A. It was a report for Workmen's Compensation. BY MR. NAULTY: Q. And as a result of that accident do you know of your own knowledge how long

Mr. Downey *received* Workmen's Compensation benefits? A. Until approximately the middle of February of 1968, when they were discontinued." It is clear that, notwithstanding his offer at sidebar to show only the application for benefits, defense counsel went further and proceeded to make inquiry about receipt of benefits. While we find it unnecessary to discuss the relevance of an application for benefits, we think it clear that to allow testimony of receipt of collateral benefits during the same period in which plaintiff sought damages from defendants was error under the decision in *Boudwin.* Unlike *Boudwin,* however, we think the error here was harmless.

Appellant concedes, as stated earlier, that the disparity between the verdict returned ($15,000) and the potential verdict (present net worth of Downey's earning capacity over a period of sixteen years, calculated by appellant's expert to be $132,000) can only indicate that appellant's theory of causation was not accepted. Downey was first said to be suffering from ALS in the year 1967. According to his theory, the fall in November, 1967 was caused by his developing sclerosis and that sclerosis was in turn caused by the automobile accident in March, 1965. Thus, the period during which Downey received workmen's compensation benefits of unspecified amounts (November, 1967 — February, 1968) was not a period in which Downey would be entitled to damages from defendants here *unless* the jury accepted his theory of causation; this, however, it admittedly did not do. Additionally we doubt that plaintiff's claim to compensation for loss of future earning capacity for a period of sixteen years (192 months) could have been prejudiced by the jury's learning of his receipt of workmen's compensation in unspecified amounts over a period of only four months.

Finding no cause to grant appellant a new trial, we affirm the judgment of the court below.

Mr. Justice ROBERTS concurs in the result.

The former Mr. Chief Justice BELL and the former Mr. Justice BARBIERI took no part in the consideration or decision of this case.