## Wivagg v. Duquesne Light Company

*Loyal H. Gregg* and *Jack Palkovitz,* for plaintiffs.

*James E. Coyne,* for defendant.

LOUIK, *J.,* July 9, 1975—This matter is before the court en banc on defendant's motion for judgment n.o.v. and plaintiffs' motion for new trial.

Plaintiffs brought this action against the Duquesne Light Company to recover economic loss and property damage to their printing business and the building in which it was located. Plaintiffs claim that the fire which destroyed the building and its contents was proximately caused by (1) negligent installation and maintenance of electrical wires and equipment immediately outside and leading into the printing shop; and (2) breaches of defendant's implied warranties of merchantability and fitness to provide safe and hazard-free electrical service. The jury found no negligence, but returned a verdict for $50,000 for breach of the implied warranties.

Defendant's contention throughout trial and in its motion for judgment n.o.v. raises the recently disputed issue of whether the courts will imply a warranty of fitness or merchantability in a sales-service hybrid transaction. More particularly, this court is confronted with the problem of determining whether an implied warranty of safe and hazard-free electrical service can arise from the supply of electricity by a public utility. Basically, defendant argues that the supply of electrical power is essentially a transaction for services, not a sale of goods within the scope of the Uniform Commercial Code of April 6, 1953, P.L. 3, as amended, 12A P.S. §§2-104(1) (merchant), 2-105(1) (goods), 2-106(1) (contract for sale; sale), 2-314 (implied warranty of merchantability and fitness for ordinary purposes), and 2-315 (implied warranty of fitness for particular purpose). Defendant argues that the implied warranties attach to sales, and since this transaction was not a sale, there can be no warranties, exclusive of those expressed. Consequently, defendant suggests that the court should apply only the traditional standard of negligence to the power company's activities relating to its electrical service. See York Heating & Vent. Co. v. Flannery, 87 Pa. Superior Ct. 19, 23-4 (1926).

To determine whether warranty or negligence law applied to a particular transaction, the Pennsylvania courts, as well as the majority of American jurisdictions, have distinguished between a sale and a service. The courts have made the distinction on the basis of whether the work or service is the essence of the transaction or whether it is merely incidental to the materials supplied. See Farnsworth, Implied Warranties of Quality in Non-Sales Cases, 57 Colum. L. Rev. 654, 663-64

(1957). However, to apply warranty concepts in those cases where the court can "find" a technical sale would seem to elevate from far beyond the true substance of a given transaction. Few sales of goods can be deemed pure sales. The manufacture, distribution and sale of a product involves the interplay of many individuals who provide various services to insure the ultimate sale to the consumer or user. See Nordstrom, Law of Sales, 47 (1970). The extremes of mere sale and the rendition of professional skill are separated by a continuum of sales-service hybrid transactions. Within this broad area falls the "service" of providing electricity. However, even if we refer to this product as a "service," it does not necesssarily require this court to conclude that no warranties of safe and hazard-free electrical power can arise. The supply of electricity is intimately associated with the apparatus and equipment by which it is generated and conducted. It is doubtful that the sales-service dichotomy does any more than describe a result reached upon the analysis of a variety of factors: White and Summers, Handbook of the Law Under the Uniform Commercial Code 289 (1972). See Delaney v. Towmotor Corp., 339 F.2d 4, 6 (2d Cir., 1964).

In Hoffman v. Misericordia Hospital, 439 Pa. 501, 267 A.2d 867 (1970), the Supreme Court resolved this issue of whether an implied warranty can attach to a sales-service hybrid transaction. In Misericordia, the court vacated the lower court's order sustaining the hospital's preliminary objections to the claim by plaintiff that his contraction of serum hepatitis from a blood transfusion was a breach of the hospital's implied warranties of merchantability and fitness for particular purpose.

The court recognized that the adoption of the code did not impede the parallel development of warranties in non-sales situations, stating:

"We therefore do not feel obligated to hinge any resolution of the very important issue here raised on the technical existence of a sale. In this respect, we agree with the following statement made by a court of a sister state: 'It seems to us a distortion to take what is, at least arguably, a sale, twist it into the shape of a service, and then employ this transformed material in erecting the framework of a major policy decision': Russell v. Community Blood Bank, Inc., 185 So. 2d 749, 752 (Fla. Ct. App. 1966). In view of our case law implying warranties in non-sales transactions, it cannot be said with certainty that no recovery is permissible upon the claim here made, even if it should ultimately be determined that the transfer of blood from a hospital for transfusion into a patient is a service: See also, Note, A New Principle of Products Liability in Service Transactions, 30 U. Pitt. L. Rev. 508 (1969)." Misericordia, supra at 507.

To arrive at this conclusion, the court relied upon Uniform Commercial Code, Comment 2 to §2-313, 12A P.S. §2-313, which provides:

"Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. They may arise in other appropriate circumstances such as in the case of bailments for hire, whether such bailment is itself the main contract or is merely a supplying of con-

tainers under a contract for the sale of their contents. The provisions of Section 2-318 on third party beneficiaries expressly recognize this case law development within one particular area. Beyond that, the matter is left to the case law with the intention that the policies of this Act may offer useful guidance in dealing with further cases as they arise."

One of the drafters of the code and a leading authority in the areas of commercial and contract law has written:

"To say that a warranty is implied in a sale is not to say that none is implied if there is no sale. Implied warranties of the quality of goods are today firmly entrenched in sales law and their growth has been paralleled by that of similar warranties where goods have been supplied under conditions not amounting to a sale. . . . Where a statute purports principally to remold the common law in a limited area to produce uniformity, there is less basis for argument that the express provisions with regard to that area imply contrary rules in other areas, and more reason to regard the act as one would the common law which it replaced." Farnsworth, supra, at 663-64.

See also Nordstrom, supra, at 43, 239 (1970). And Justice Francis wrote in Cintrone v. Hertz Truck Leasing Co., 45 N.J. Super. 434, 446 (1965):

"There is no good reason for restricting such warranties to sales. Warranties of fitness are regarded by law as an incident of a transaction because one party to the relationship is in a better position than the other to know and control the condition of the chattel transferred and to distribute the losses which may occur because of a dangerous condition the chattel possesses. These

factors make it likely that the party acquiring possession of the article will assume it is in a safe condition for use and therefore refrain from taking precautionary measures himself. 2 Harper and James, Torts, §28.19 (1956). Harper and James point out that the presence of such factors in sales set in motion the development of the doctrine of implied warranties. They decry the notion, however, that because the doctrine had its origin in sales, the warranty protection should be withheld in other situations when the same considerations obtain. And they argue persuasively that in the face of present-day forms of business enterprise, development of the warranty doctrine in sales would point the way by suggestive analogy to similar results in cases where a commodity is leased. Id., at p. 1577.

"In this connection it may be observed also that the comment to the warranty section of the Uniform Commercial Code speaks out against confining warranties to sales transactions."

See also Newmark v. Gimbel's Inc., 102 N.J. Super. 279 (1968).

In acknowledging that decisional warranties can be implied in nonsales transactions by analogy to the Uniform Commercial Code (see Farnsworth, supra, at 667-69), the Misericordia court sanctioned a case-by-case approach to the resolution of this issue. The trial court must determine "whether the policies for which warranties are implied in law would be furthered by their implication in this situation." Misericordia, supra, at 508. Subsequent to the decision in Misericordia, the Pennsylvania legislature enacted a statute which eliminated the cause of action for breach of implied warranty in cases involving blood transfu-

sions, medical transplants and the like: Act of January 28, 1972, P.L. 20 (No. 9), 35 P.S. §10021. Although the statute precludes liability under the particular circumstances of the Misericordia case, the general principle of proceeding along policy lines, established in that case, remains unaffected by the act.

The Pennsylvania Supreme Court has repeatedly declared the social policy considerations underlying the imposition of liability upon those who make or market a defective product, in the absence of proof of negligence: (1) Public interest in safeguarding the consumer from his own inability to protect himself from harm caused by the defectively manufactured product; (2) societal pressure upon those who market and advertise the product to meet their implied assurances of the safety of the goods, and (3) the superior risk-bearing ability of the manufacturer and seller to spread the cost of the injury through the price of the product or by liability insurance: Salvador v. Atlantic Steel Boiler Co., 457 Pa. 24, 33, n. 15, 319 A.2d 903 (1974); Kassab v. Central Soya, 432 Pa. 217, 230, n. 6, 246 A.2d 848 (1968); Bialek v. Pittsburgh Brewing Co., 430 Pa. 176, 187, 242 A.2d 231 (1968).

In the case of a public utility which manufactures, distributes, retails and continuously maintains its product, the above-recited socioeconomic factors are particularly applicable. The imposition of warranty liability upon Duquesne Light flows naturally from its position of total responsibility for its electrical service. Defendant has complete control of electricity to the point of its entry into the customer's building. It was the alleged contact of the high voltage primary lead with the secondary

service drop which plaintiffs claim brought about a surge of high voltage into the brick dwelling. The jury apparently accepted this contention to return its verdict of breach of warranty. By the nature of defendant's electrical service, plaintiffs were unable to protect themselves from this happening and were forced to rely upon defendant's skill and electrical apparatus for providing safe and hazard-free electrical power. Defendant's enterprise is of sufficient size to warrant distribution of the risks and/or enable it to bear the losses from the application of the code's warranty concepts. Though defendant argued that Misericordia does not compel this court to hold defendant to the standards of warranty law, defendant provided this court with no facts to refute the finding of liability upon the policies referred to in Misericordia. Thus, this court concludes that the transaction involved herein is sufficiently analogous to a "sale" to justify the extension of the code's warranty protection to the injured parties. An implied warranty of safe and hazard-free electrical service arises from the supply of electricity by defendant public utility: Buckeye Union Fire Insurance Co. v. Detroit Edison Co., 196 N. W. 2d 316, 318 (Mich. App., 1972). See Gardiner v. Philadelphia Gas Works, 413 Pa. 415, 197 A.2d 612 (1964), wherein the court held the code's four-year period of limitations controlling in an action for defendant public utility's alleged breach of warranty of safe transmission of gas through safely maintained underground conduit. It is significant to note that in a footnote to the Gardiner, supra, at 420, n. 8, the court stated:

"It is undisputed that the supplying of gas to Gardiners' home on a month-to-month basis falls

within the definitions of a 'contract for sale' or 'sale' within §2-106 of the Code, 12 P.S. §2-106."

Defendant also argues in its motion for judgment n.o.v. that even if the court finds that warranties of merchantability and fitness for particular purpose were implied in the continuous transaction between the public utility and its customer, plaintiffs did not substantiate their claim of breaches thereof. A judgment n.o.v. may be entered only in a clear case, free from conjecture, where the facts are such that reasonable minds cannot differ on the impropriety of the jury's verdict. In considering the motion, the evidence must be viewed in the light most favorable to the verdict winner. This court may not draw its own inferences from the testimony, but rather, it must give plaintiff the benefit of every favorable inference of fact which the jury might have drawn from the evidence: Fallon v. Penn Central Transp. Co., 444 Pa. 148, 152, 279 A. 2d 164 (1971); Hilscher v. Ickinger, 194 Pa. Superior Ct. 237, 241, 166 A. 2d 678 (1960), affirmed 403 Pa. 596, 170 A. 2d 595 (1961).

In reviewing the evidence in this manner, this court finds that plaintiff produced sufficient evidence upon which the jury could have reasonably inferred the facts necessary to establish liability on the part of defendant. Two neighbors and one individual who resided in the second floor of the destroyed building heard a loud popping sound outside at about 1:50 a.m. on the day of the fire. The transformer outside of the dwelling was smoking, but all of the witnesses, including the police, saw no flames at that time. A power failure followed in the neighborhood. A few minutes after 4 a.m., the building was reported on fire which brought about

the damage alleged. A neighbor, a wife of one of the plaintiffs and a Wivagg employe testified that the high voltage primary lead wire running to the transformer was loose and swayed in the wind. These facts were corroborated by a lineman for Duquesne Light. Plaintiffs' expert, a licensed professional electrical engineer, stated that, as a result of high winds on the day of the fire, the loose lead wire came in contact with the secondary service drop cable, which allowed a surge of high voltage to flow through the service drop into the printing shop. According to the engineer, the momentary surge tripped the circuit breakers inside the shop; and upon disassembly, he found their contacts arced, indicating that they had interrupted short circuits. The expert inspected the premises about a week after the fire and found the worst damage to the building underneath the first floor in the crawl space where all the wiring ran. According to plaintiffs' expert, the electrical system short-circuited, the insulation of the wires in the crawl space broke down, and a fire smoldered unnoticed by the neighbors, Duquesne Light crew and police. A few hours later, the fire was visible to those outside the printing shop. Much of this evidence was contradicted by defendant's expert; however, it was within the province of the jury to resolve this conflict. "In a case, such as this, where evidence is conflicting on a material fact, judgment n.o.v. cannot be entered." Burg v. Aberman, 183 Pa. Superior Ct. 1, 4, 128 A.2d 179 (1956). Accordingly, this court will not grant defendant's motion for a judgment n.o.v.

In their motion for a new trial, plaintiffs basically contend that the jury's verdict in the amounts of $15,000 damage to the building and

$35,000 damage to the printing company was grossly inadequate. It is well settled that:

"So long as the verdict bears a reasonable resemblance to the damages proved, it is not the function of the court to substitute its judgment for that of the jury: [citations]. The mere fact that [this court] would have been more generous to the [plaintiff] does not justify ousting the jurors and moving into their seats: [citations]. Consequently, when the verdict is substantial, even though it may be low, the granting of a new trial on the ground of inadequacy must be reversed: [citations]." Morris v. Peckyno, 202 Pa. Superior Ct. 490, 492-93, 198 A. 2d 396 (1964).

As stated by Justice Bok in Elza v. Chovan, 396 Pa. 112, 115, 152 A.2d 238 (1959):

"It is the province of the jury to assess the worth of the testimony and to accept or reject the estimates given by witnesses. If the verdict bears a reasonable resemblance to the proven damages, it is not the function of the court to substitute its judgment for the jury's: [citations].

"The mere fact that a verdict is low does not mean that it is inadequate. . . .

"There is no magic in amounts but only in the circumstances, and compromise verdicts are both expected and allowed: [citations]. The compromise may arise out of damages or negligence or the balance of evidence concerning either or both, and the grant of a new trial may be an injustice to the defendant rather than an act of justice to the plaintiff: [citation]."

Upon review of this case, the evidence does not indicate partiality, prejudice or passion on the part of the jury. Though plaintiffs' testimony was that the reduction in market value to the building be-

cause of the fire was $70,250, the actual cost of repairing the fire damage was $61,802.36 and the damages to the printing company was $221,114, this court can find no injustice in the jury verdict so as to "stand forth like a beacon." Elza, supra at 117-18. The jury returned a substantial award in the amount of $50,000. The jury may very well have found that the figures proposed by plaintiffs were overinflated. For instance, the assessed value of the property, approximately $14,000, indicated quite a different figure with respect to the building's market value. Merely because plaintiffs' evidence as to the damages was uncontradicted did not obligate the triers of fact to give an unconsidered rubber stamp to plaintiffs' claim. The extent of plaintiffs' damages was a factual matter for the jury's determination: Morris, supra, at 494.

Finally, plaintiffs complain that defendant withheld pertinent information in its answers to interrogatories and in depositions so as to prevent the disclosure of a material witness. Plaintiffs posit that this witness, a lineman who worked at the site on the morning of the fire, may have been the employe of defendant who installed insulating material on the primary lead, and, hence, could have testified to crucial information about the cause of the power failure and its effects upon the transformer and other apparatus. It is doubtful that this witness' testimony would have materially affected the outcome of this case, since plaintiffs did recover on their theory of breach of warranty and any such assumed facts would have not led the jury reasonably to a conclusion of negligence. Moreover, no harm seems to have come to plaintiffs, for the trial court charged the jury that they could conclude from the unexplained absence of a

witness who has knowledge of facts material to a party's case, that such a witness, if present, would testify unfavorably to that party. See Downey v. Weston, 451 Pa. 259, 266, 301 A.2d 635 (1973).

Therefore, defendant's motion for judgment n.o.v. is dismissed and plaintiffs' motion for new trial is refused.

## ORDER

And now, July 9, 1975, after consideration of defendant's motion for judgment n.o.v. and plaintiffs' motion for new trial, it is hereby ordered, adjudged and decreed that defendant's motion for judgment n.o.v. be and the same is hereby dismissed and it is further ordered, adjudged and decreed that plaintiffs' motion for new trial be, and the same is hereby, refused.