**Kehler v. Carrasquillo**

*Alisa P. Marion,* for appellants.
*Kenneth A. Goodman,* for appellees.

STALLONE, *J.,* April 19, 2005—This is an automobile negligence action arising out of a two-car, "rear-end" collision which occurred on April 4, 1997, between a vehicle being driven by the appellant John G. Kehler, and a second vehicle being driven by appellee John A. Carrasquillo and owned by his wife, appellee Karen A. Carrasquillo. In their complaint, Mr. Kehler and his wife, appellant Irene Kehler, asserted claims for negligence on the part of Mr. Carrasquillo and for negligent entrustment against Mrs. Carrasquillo.[1] After a three-day trial, a jury found in favor of Mr. and Mrs. Carrasquillo on the basis that the admitted negligence of Mr. Kehler was not a factual cause[2] of the harm complained of by the appellants.

Mr. and Mrs. Kehler filed a motion for post-trial relief, which we denied after hearing oral argument.[3] They thereafter filed a timely appeal to the Superior Court of

1. Mrs. Kehler asserted a separate claim for loss of consortium against both Mr. and Mrs. Carrasquillo.

2. All italicized language is for emphasis only.

3. See Pa.R.C.P. 227.1.

Pennsylvania, in which they are raising two issues for appellate review.

Mr. and Mrs. Kehler first contend that this court erred in denying their motion to strike the jury impaneled on August 17, 2004,[4] which was not filed until November 1, 2004, two days prior to the start of trial.[5] In making this claim, Mr. and Mrs. Kehler are alleging that certain statements made by this court during the course of jury selection demonstrated the court's bias, partiality and prejudice against them relative to the merits of this case.

Under Pennsylvania law, there is no doubt that parties to a lawsuit are entitled to a trial before an impartial jury which has not been influenced by a trial court's showing of bias, partiality or prejudice toward either side. *Downey v. Weston,* 451 Pa. 259, 301 A.2d 635 (1973). In order for the moving party to prevail, however, such conduct must be clearly reflected in the record. *Corbin v. Cowan,* 716 A.2d 614, 619 (Pa. Super. 1998) (quoting *Nemeth v. Nemeth,* 306 Pa. Super. 47, 53, 451 A.2d 1384, 1388 (1982)).

---

4. In their concise statement of matters complained of on appeal filed pursuant to Pa.R.A.P. 1925(a), Mr. and Mrs. Kehler allege:

(a) The court erred in denying their motion to strike the jury impaneled on August 17, 2004; and

(b) The jury was impermissibly prejudiced during the voir dire process on August 17, 2004, and thus rendered a verdict that clearly shocks the conscience and must be set aside and a new trial granted.

Since both of these two issues relate to what transpired at jury selection, we have elected to treat them as one in the interest of judicial economy.

5. We denied this motion after hearing oral argument on the morning of the first day.

The transcript of the jury selection shows that Bradley T. Beckman, Esquire, who was representing Mr. and Mrs. Kehler at the time of jury selection, asked the following question of the entire jury venire on August 17, 2004 (N.T., jury selection, p. 11):

"Is there anybody that believes that, because of their upbringing, moral, religious or other beliefs, that they would have a difficult time setting aside whatever beliefs that they have to award money damages to the plaintiff if you believe the plaintiff is entitled to money damages?" which led to the following response from juror no. 32 and reply from this court (N.T., jury selection, pp. 11-13):

"Wilson Kauffman: Juror no. 32, Wilson Kauffman. I would have a problem with that. *It sounds like it's been a long time between what happened and today's proceeding. . . .*

"The Court: *Counsel, you asked a very broad question and I just want you to know that whatever response there is here is not going to constitute a basis for a mistrial. I'm not going to start all over with another jury . . . you know what I am talking about and I don't like that (kind of) question to begin with. Does anyone feel this or does anyone feel that or does anyone have a problem with this or that.*

*"I don't think they are appropriate questions but I am going to let you ask them. But I am letting you know that you're going to have to live with whatever those answers are and don't tell me those answers by the juror taint the jury (panel) and, therefore, you want to discharge the jury and start all over again at another time."*

Not being content with allowing the matter to end at that point, Attorney Beckman continued to press the issue, not at side-bar but in front of the entire venire (N.T., jury selection, pp. 13-15):

"Mr. Beckman: Okay. First, I want to say in my career I have never had occasion to ask any court to throw out the panel. *But I want to respond to why this case has taken so long.* John Kehler was driving the car and he hired a lawyer, he hired Alisa Marion who works in my office. The lawsuit was filed within the time period allowed under Pennsylvania law, two years you have got to file it. *It is not up to the lawyers to pick the trial date. We just work here. We are subject to the rules of this honorable court.*

"Wilson Kauffman: You asked me—

"The Court: So now you say it is this court that didn't pick a trial date. When was the case certified ready for trial?

"Mr. Beckman: I don't have that information with me, your honor.

"The Court: *The answer is that the court, the judges, have nothing to do with when the case is going to come before a jury for trial until it's certified by the lawyers for trial. You know, I can only tell you this, that the case had not been given to me until maybe four or five months ago. But when was it certified for trial?*

"Mr. Beckman: When this case was with another judge here in Berks County for some reason, unbeknownst at least to me, it was transferred to your honor . . .

"The Court: Well, the case was transferred to me for trial on April 13, 2004. It wasn't certified for trial until

November 12, 2003. So that should answer the question. Does that answer your question?

"Wilson Kauffman: I was attempting to answer his question. He asked if anybody had any beliefs why— that would hinder their ability to judge or make a decision in the case, which it's been a long time. There are a lot of lawsuits clouding our courts. From my upbringing, you have—now, I don't want to say what's on my mind but I don't think that—I think it should have been handled a long time ago, not wait this long.

"The Court: Well, the system in Pennsylvania is that the case does not come to the court for trial until the lawyers say they are ready for trial. And that date is what I said, November 12, 2003.[6]

"Wilson Kauffman: I just mean from 1997 with the accident date until—

"The Court: That's right and that's why I am going into this because I don't like when the perception out

---

6. This case was certified as ready for trial before Judge Jeffrey L. Schmehl, to whom this case was originally assigned, on November 12, 2003. On January 8, 2004, Judge Schmehl held a pretrial settlement conference with the parties. He subsequently reassigned this case to the undersigned, in his capacity as administrative head of the Civil Court, on February 4, 2004, and scheduled jury selection for April 13, 2004. Attorney Beckman conveniently failed to inform the venire, that it was at the request of his office, that jury selection was continued from April 13, 2004 to May 10, 2004, and then at his request a second time from May 10, 2004 to August 17, 2004, the day that the jury was impaneled. Interestingly, it appears from the record that, based upon defense counsel's cross-examination of Robert Singh M.D., Mr. and Mrs. Kehler's expert witness, that his report was not submitted to their counsel until August 10, 2004, these requested continuances were not based on conflicts with other trial attachments, as represented to this court, but because Attorney Beckman's office was not ready for trial.

there is that it takes our courts here in Pennsylvania a long time to get the work done."

As jury selection was progressing and while individual voir dire was being conducted of several other prospective jurors, Attorney Beckman once more initiated the following colloquy, this time at side-bar, with this court (N.T., jury selection, pp. 29-30):

"Mr. Beckman: Judge, I would like to put on the record right up front that I think it was inappropriate to have that speech directed at me about the timing of this case in front of this jury panel. I had nothing to do with why my client did not get this case to trial and I think it was inappropriate for the court to make the comments that were made, and to allow that one potential juror to stand up and make his speech as to why he felt it's wrong for an accident that occurred in 1997 to come to this court.

"The Court: *Mr. Beckman, as I said earlier, you're the one who invited that answer by asking that question that was so broad. That's how that came up. And then you were the one who responded by placing it (the blame) on the court. It is the responsibility of the lawyers. We have nothing to do with when the cases come up.*

"*The only thing that I did not know the answer to was that question and I responded to that because this jury may be interested in hearing it.* You're the one that opened the door to it. That's all that was said here . . . ."

Clearly, the record shows no evidence of bias, prejudice, or partiality on the part of this court, but only our effort to answer a prospective juror's question and to clarify statements made by Attorney Beckman attributing responsibility to this court for any perceived delay in bringing this case to trial. We wanted to make it clear

that a civil case does not come before the court until it is certified as ready for trial by counsel for the parties. Clearly, nothing was said by this court that was prejudicial to Mr. and Mrs. Kehler and/or the merits of their case.

The bottom line is that we are not persuaded that the jury's verdict was impacted in any way by what transpired during jury selection, especially given the fact that juror no. 32 was stricken by agreement of counsel for cause and did not serve as a member of the trial jury; that the actual trial did not begin until November 3, 2004, more than two and one half months later (with the consent of the parties), and that Mr. and Mrs. Kehler were represented by different counsel, Alisa P. Marion, Esquire, at the trial. Accordingly, we did not err in denying their motion to strike jury impaneled on August 17, 2004.

Secondly, Mr. and Mrs. Kehler argue that the jury's verdict should be set aside and a new trial granted on the basis that it was against the weight of the evidence.[7] We strongly disagree.

In Pennsylvania, the decision as to whether to grant a new trial based on a weight of the evidence claim is within the sound discretion of the trial judge. *Martin v. Evans,* 551 Pa. 496, 502-503, 711 A.2d 458, 461 (1998). A new trial based on a weight of the evidence claim will not be granted unless the verdict is so contrary to the evidence as to shock the court's sense of justice. *Daniel v. William*

---

7. In their concise statement of matters complained of on appeal, Mr. and Mrs. Kehler allege, as a separate issue, that the jury's failure to award damages was contrary to the law. However, as both issues are essentially the same, we will likewise treat them as one single issue for purposes of this appeal.

*R. Drach Co. Inc.,* 849 A.2d 1265, 1276 (Pa. Super. 2004); *Nemirovsky v. Nemirovsky,* 776 A.2d 988, 993 (Pa. Super. 2001). More importantly, a mere conflict in the testimony will not suffice as grounds for a new trial. *Id.*

In this case, Mr. and Mrs. Kehler presented testimony from Robert Singh M.D., an expert in the fields of sports medicine and emergency medicine. He testified that it was his opinion, within a reasonable degree of medical certainty, that Mr. Kehler had suffered a herniated disc as a result of the April 4, 1997 collision. (N.T., trial, pp. 116-17.) In response, Mr. and Mrs. Carrasquillo presented expert testimony from Peter Feinstein M.D., an orthopedic surgeon, and from Todd Siegel M.D., a radiologist.

In his videotaped deposition testimony, Dr. Feinstein admitted that he initially agreed that Mr. Kehler had sustained a herniated disc at the C5-6 level as a result of "trauma," and that it resulted from the April 4, 1997 collision. (N.T., videotaped deposition of Peter Feinstein M.D., pp. 18, 19, 26, 28.) However, after defense counsel had sent him additional records which showed that Mr. Kehler had received chiropractic treatment over a two- to three-month period in 1995 following a minor motor vehicle collision,[8] he could not now say with certainty whether that trauma was in the form of the 1995 motor vehicle collision or a "slip and fall" that Mr. Kehler sustained at work in 1998. (N.T., videotaped deposition of Peter Feinstein M.D., pp. 27-28, 29, 33.) Therefore, Dr. Feinstein was no longer of the opinion that the herni-

---

8. It is undisputed that Mr. Kehler did not receive any medical treatment whatsoever and was completely asymptomatic with regard to his cervical spine between December 1995, and April 4, 1997. (N.T., videotaped deposition of Peter Feinstein M.D., p. 35.)

ated disc at C5-6 was caused by the April 4, 1997 collision. (N.T., videotaped deposition of Peter Feinstein M.D., pp. 27-28.) Dr. Feinstein attributed the change in his opinion, in part, to his belief that Mr. Kehler had not been truthful about his medical history at the time that he examined Mr. Kehler. (N.T., videotaped deposition of Peter Feinstein M.D., p. 24):

"One is he denied ever having any subsequent injuries to the automobile accident in 1997 and that's not the truth. The second is that the nature of that injury in 1998 was sufficient in his own right to cause symptoms and problems as he presented to me when I did my independent medical evaluation, whether an accident occurred in 1997 or not. So he's got two issues here. One is he had problems before the accident and then he had an accident—another injury after the accident, both of which he denied."

Moving on to Dr. Siegel, the record shows that he also agreed that Mr. Kehler had suffered a herniated disc at the C5-6 level. (N.T., videotaped deposition of Todd Siegel M.D., p. 34.) However, Dr. Siegel was of the opinion that the herniation was caused not by trauma, but by progressive degeneration of the disc at C5-6. (N.T., videotaped deposition of Todd Siegel M.D., p. 34.) He testified that he based his opinion upon x-rays which were taken immediately after the 1995 motor vehicle collision, which showed mild degenerative disc disease already present at the C5-6 level. (N.T., videotaped deposition of Todd Siegel M.D., pp. 25, 26, 34.) According to Dr. Siegel, Mr. Kehler's disc herniation was associated with the formation of "spurs," and that chronic disc herniation was causing compression of his spinal cord. (N.T.,

videotaped deposition of Todd Siegel M.D., p. 36.) Dr. Siegel's opinion, within a reasonable degree of medical certainty, was that Mr. Kehler's herniated disc was attributable to a chronic degenerative process that pre-existed the April 4, 1997 collision, and that the x-rays did not show any progression in the degenerative process between 1995 and 1997. (N.T., videotaped deposition of Todd Siegel M.D., pp. 29, 36, 37.) As a result, the C5-6 disc herniation did not occur as a result of the April 4, 1997 collision. (N.T., videotaped deposition of Todd Siegel M.D., p. 142.)

Under Pennsylvania law, it is well settled that it is the jury's duty to evaluate all of the evidence and to resolve questions of credibility and conflicts in the evidence; and, where a verdict is based on substantial, even though conflicting, evidence, it is conclusive. *Stewart v. Owens-Corning Fiberglas,* 806 A.2d 34 (Pa. Super. 2002); *Vattimo v. Eaborn Truck Service Inc.,* 777 A.2d 1163 (Pa. Super. 2001). Here, the jury, after considering all of the evidence, including the testimony of Dr. Singh, Dr. Feinstein and Dr. Siegel, determined that Mr. and Mrs. Kehler had failed to meet their burden of proving by a preponderance of the credible evidence that the April 4, 1997 collision was a factual cause of the harm complained of.

Based upon our review of the record, we see no reason to disturb the jury's verdict and, therefore, we reject their claim that the verdict was contrary to the weight of the evidence.

And so, for these reasons, we affirm our denial of Mr. and Mrs. Kehler's motion for post-trial relief and respectfully request that this appeal be denied.