Brooke **BRADY**, a Minor, by her Parents and Natural Guardians, Scott E. BRADY and Kim A. Brady, and Scott E. Brady and Kim A. Brady, in their own right, Appellants,

v.

**BALLAY, THORNTON, MALONEY MEDICAL ASSOCIATES, INC., and R. Scott Thornton, M.D.**

Superior Court of Pennsylvania.

Argued Oct. 16, 1997.
Filed Dec. 8, 1997.
Reargument Denied Feb. 13, 1998.

Marc G. Brecher, Philadelphia, for appellants.

George L. Young, Jr., Blue Bell, for appellees.

Before CIRILLO, President Judge Emeritus, and EAKIN and OLSZEWSKI, JJ.

CIRILLO, President Judge Emeritus:

Brooke Brady, a minor, and her parents, Scott E. Brady and Kim A. Brady (the Bra-

dys), appeal from the order of the trial court denying their post-trial motions and entering judgment in favor of Appellees, Dr. R. Scott Thornton, and Ballay, Thornton, Maloney Medical Associates, Inc. We affirm.

The instant appeal concerns a medical malpractice action instituted by the Bradys against appellees, R. Scott Thornton, M.D. and the professional association in which he is a partner, Ballay, Thornton, Maloney Medical Associates, Inc.[1] The Bradys claim that their daughter, Brooke, sustained permanent injuries as a result of complications caused by the appellees during her delivery.

On June 23, 1989, at approximately 10:45 a.m., Kim Brady (Kim) was admitted to Holy Redeemer Hospital in labor. Kim had been under the gynecological and obstetrical care of Dr. Thornton throughout her pregnancy. Approximately three hours after she was admitted to Holy Redeemer, Kim was injected with the drug, Pitocin, in order to facilitate the progression and intensity of her contractions. When Dr. Thornton became concerned that the baby's fetal heart rate was periodically decelerating over the three hours following the injection, he transferred Kim to the delivery room where he attempted to deliver Brooke. During delivery, Dr. Thornton used a vacuum extractor to aide in the baby's expulsion from the womb. The baby's shoulders, however, became stuck in Kim's pelvis which required Dr. Thornton to manually manipulate the baby's body to remedy the complication. As he attempted to resolve the shoulder problem, Dr. Thornton accidentally stretched the baby's brachial plexus (neck) nerves. Brooke now suffers from permanent, limited use of her left arm and shoulder as a result of the stretching of her neck nerves during delivery.[2]

During trial, the Bradys' expert, Dr. Steven R. Goldstein testified (via videotaped deposition) that Dr. Thornton misinterpreted the fetal heart rate tracings taken in the labor room after the injection of Pitocin into Kim's system. The deceleration of the baby's heart rate, he testified, was merely a normal effect of the drug, and not a sign of fetal distress. Dr. Goldstein testified that had Dr. Thornton discontinued the Pitocin earlier, the baby's heart rate would have normalized and Kim would have been able to continue with a normal labor and delivery without the use of a vacuum extractor. Had the vacuum not been used, Goldstein claimed, the baby would not have had a problem with her shoulders fitting through Kim's pelvis, and, thus, no nerve injury would have resulted.

After a jury trial, a verdict was returned in favor of appellees. Post-trial motions were filed and denied by the trial court. The Bradys now appeal, raising the following issues for our consideration:

(1) Did the trial court err when it permitted appellees/defendants' expert Joseph S. Ferroni, M.D., to testify beyond the fair scope of his report?

(2) Did the trial court err by precluding appellants/plaintiffs from presenting evidence that appellees/defendants' expert, Dr. Ferroni, was currently being sued by a patient for negligently performed surgery which had been subsequently corrected by appellee/defendant, Dr. Thornton, who would likely be a key fact witness at the trial of Dr. Ferroni's medical malpractice action which had yet to take place at the time of this trial?

(3) Did the trial court err when it limited appellants/plaintiffs' cross-examination of appellees/defendants' expert, Dr. Ferroni, concerning the fact that Dr. Ferroni was also presently being represented by appellees/defendants' attorney, George L. Young, Jr., in a pending medical malpractice claim?

In their first issue on appeal, the Bradys claim that the trial court erred in allowing Dr. Ferroni, the defendant's medical expert, to testify beyond the fair scope of his written expert report produced during pre-trial discovery. The discrepancy between his writ-

---

1. Holy Redeemer Hospital and Medical Center were also defendants in the Brady lawsuit. Pursuant to a stipulation signed by all parties, however, the hospital and medical center were dismissed from the case.

2. The brachial plexus nerves, which are located in and around a person's neck area, control the functioning of one's upper extremities.

ten and oral testimony, they claim, exposed them to undue prejudice and surprise and constitutes reversible error warranting a new trial.

■ The standard of review of a trial court's grant or denial of a motion for a new trial is whether the trial court clearly and palpably abused its discretion or committed an error of law which controlled the outcome of the case. *Stevenson v. General Motors Corp.*, 513 Pa. 411, 420, 521 A.2d 413, 422 (1987). To reverse the trial court, the superior court must consider all the evidence in the light most favorable to the appellee and conclude that the verdict would be changed if another trial were granted. *Robertson v. Atlantic Richfield Petroleum Products Co.*, 371 Pa.Super. 49, 537 A.2d 814 (1987).

■ Admission of expert testimony is a matter within the sound discretion of the trial court and will not be disturbed absent a manifest abuse of discretion. *Walsh v. Kubiak*, 443 Pa.Super. 284, 661 A.2d 416 (1995) (*en banc*). Where, however, it is evident that the trial court has misapplied the law or reached a manifestly unreasonable, biased, or prejudiced result, this court will find the error reversible. *Chanthavong v. Tran,* 452 Pa.Super. 378, 682 A.2d 334 (1996).

In *Walsh, supra,* the trial court limited the appellant's expert to the sole issue presented in his pre-trial report, namely, the issue of whether the appellee's doctor had negligently performed appellee's back operation. On appeal, the appellant contended that the trial court erred in prohibiting his expert from testifying regarding the necessity of the operation. *Walsh,* 443 Pa.Super. at 289, 661 A.2d at 419. Our court affirmed the trial court's limitation of the appellant's expert's testimony, finding that:

> Because a fair reading of Dr. Murtagh's [Appellant's expert] report does not provide sufficient notice concerning any opinion on his part that the surgery was indeed necessary, [Appellee] would not have been able, based upon the report, to anticipate such testimony and adequately prepare to cross-examine Dr. Murtagh and rebut his testimony on such point. Furthermore, [Appellee's] expert, Dr. Romy, the only

expert witness who could have rebutted Dr. Murtagh's proposed testimony, had already testified and had been dismissed as a witness at the time of Dr. Murtagh's testimony. Therefore, [Appellee] had no expert witness available to listen to and observe the testimony of the defense expert in order to assist [Appellee's] counsel in challenging Dr. Murtagh's opinion on cross-examination and in preparing a proper rebuttal.

*Walsh,* 443 Pa.Super. at 293–94, 661 A.2d at 421. In essence, the *Walsh* court found that because the Appellee would have been prejudiced by the introduction of appellant's expert's testimony, the trial court properly limited the scope of such testimony to the "four corners" of the expert's pre-trial report. *See Havasy v. Resnick,* 415 Pa.Super. 480, 609 A.2d 1326 (1992), *allocatur granted,* 533 Pa. 625, 620 A.2d 491 (1993) (where physician's pre-trial report focused exclusively on the care rendered to the plaintiff during the first week following his accident, subsequent trial testimony attempting to impugn another doctor who was not involved in plaintiff's post-accident case was properly excluded by the trial court).

> Pennsylvania Rule of Civil Procedure 4003.5 states, in part: To the extent that the facts known or opinion held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, his direct testimony at the trial may not be inconsistent with or go beyond the fair scope of his testimony in the discovery proceedings as set forth in his deposition, answer to an interrogatory, separate report, or supplement thereto.

Pa.R.C.P. 4003.5(c). When applying the "fair scope" rule to cases, our court has held that:

> In deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair[.]" The question to be answered is whether, under the particular facts and circumstances of the case, *the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the response.*

*Jones v. Constantino,* 429 Pa.Super. 73, 83–84, 631 A.2d 1289, 1294–95 (1993) (emphasis added) (citing *Dible v. Vagley,* 417 Pa.Super. 302, 315, 612 A.2d 493, 499 (1992)), *quoting Wilkes–Barre Iron v. Pargas of Wilkes–Barre,* 348 Pa.Super. 285, 290, 502 A.2d 210, 212–[1]3 (1985). *Accord Chanthavong v. Tran,* 452 Pa.Super. 378, 682 A.2d 334 (1996); *Pascale v. Hechinger Co. of P.A.,* 426 Pa.Super. 426, 627 A.2d 750 (1993).

In *Jones, supra,* our court found that the discovery rules do not allow an expert to make a "bald allegation of non-negligence in his expert report and then proffer an **in-depth theory explaining the absence of culpability at trial.**" *Id.* at 86, 631 A.2d at 1296 (emphasis added). The *Jones* court based its finding, in part, on the policy and purpose served by limiting the scope of an expert's trial testimony:

> We have found that the above limitation on the scope of the expert's testimony "serves to insure that an expert's report will be sufficiently comprehensive and detailed to inform an opposing party of the expert's testimony at trial." [citation omitted]
>
> \*　　\*　　\*
>
> As noted, *supra,* Rule 4003.5 "favors the liberal discovery of expert witnesses and disfavors unfair and prejudicial surprise." To accept appellant's position we would be sanctioning ambiguity and avoidance in separate reports.

*Jones,* at 85–86, 631 A.2d at 1295–96.

Presently, the Bradys object to the fact that the trial court permitted Dr. Ferroni to testify regarding an entirely new area that was not mentioned in his pre-trial report—namely, that due to sudden fetal distress evinced by the fetal monitor in the delivery room, the baby was in imminent danger, and, therefore, the delivery necessitated the use of a vacuum extractor.

In the present case, Dr. Ferroni, the appellee's medical expert, submitted a pre-trial report based upon a review of the complaint and answer, oral depositions, appellees' office records, hospital records, and personal doctor records. The report initially details Kim's pre-natal care under Dr. Thornton and then proceeds to give an in-depth description of Kim's entire labor, culminating in Brooke's birth. Dr. Ferroni's report mentions the baby's fetal heart tone baseline while Kim was in the labor suite. According to the report, Kim was first administered Pitocin at 13:10. This drug was later discontinued in the labor suite when the fetal heart tone baseline reached 100 beats per minute. Dr. Ferroni's report explains that a vacuum extractor was used for Kim's vaginal delivery. He also notes that "[t]here was a shoulder dystocia encountered after delivery of the head [of Brooke].... The infant was vigorous at birth, but was found to be 'favoring' the left [sic] arm. [A]rrangements for physical therapy and follow-up were made prior to discharge."

In order to determine whether a fair reading of Dr. Ferroni's expert report provided sufficient notice concerning any opinion on his part that the baby was in imminent danger necessitating the use of the vacuum extractor during delivery, it is incumbent upon us to ascertain whether, based upon any pre-trial reports, the Bradys could anticipate such testimony and adequately prepare to cross-examine Dr. Ferroni and rebut his testimony on such point.

The following portion of Dr. Ferroni's report contains any and all reference to Brooke's heart tone monitoring, any danger to Brooke during delivery, and the use of a vacuum extractor in Kim's delivery process:

> At 1430 [still in the labor room], fetal heart tones showed slight decrease in rate after the beginning of a contraction, but returned to baseline before the end of the contraction. Dr. Thornton was notified of the monitor tracing.
>
> At 1500, Dr. Thornton examined the patient and found her to be 7 centimeters dilated and −1/0 station. At 1510, the examination was 10 centimeters dilated, and the vertex is recorded as −2 station, although this station notation seems to be in error. The patient began pushing, and the pitocin was decreased at 1530 because the nurse stated that the contractions were too close together. At 1355[sic], fetal heart tone baseline was noted to be 100 beats per minute. The patient received oxygen by nasal canula, and the pitocin drip was

discontinued. The patient was taken to the delivery room as 1605.

At 1624, a viable female infant, weighing 8 lbs., 1 oz. Was delivered vaginally with the aid of a vacuum extractor. Apgar scores on the infant were 8 and 9. There was shoulder dystocia encountered after delivery of the head. Dr. Thornton attempted suprapubic pressure, a fourth degree extension of the episiotomy, leg extension, and finally, sweeping of the posterior arm across the chest to allow delivery of the shoulders.

In the portion of the expert report, titled "Medical Opinion," Dr. Ferroni opined that there were three questions which had to be considered in order to determine whether Dr. Thornton was negligent in his care of Kim Brady during her pregnancy, labor and delivery. Of these three questions, two are related to the issue presented in the present appeal

1. Did Mrs. Brady exhibit any prenatal factors which would indicate that she would be at higher than normal risk to develop shoulder dystocia[3] at delivery?

2. Did anything occur during her labor or delivery to increase the risk that the patient might experience difficulty with delivery of the infant's shoulders?

In his response to these questions, Dr. Ferroni's report indicates that Mrs. Brady did not have any of the risk factors which could be recognized during the prenatal period which would have predisposed her fetus to having developed shoulder dystocia. In addition, the expert also determined that Dr. Thornton correctly handled Mrs. Brady's labor: he increased the pitocin when needed, decreased it when her contractions were too close together, and discontinued the drug when the baby's heart tone decelerated. Finally, Dr. Ferroni opined that the reason that a vacuum extractor, as opposed to forceps, was used to deliver the baby from the birth canal was because it is a more "gentle way of delivering the head than forceps. The fact that forceps were not used in this case is evident that undue traction was not needed for delivery of the head." Dr. Ferroni's re-

port also acknowledged that once a baby's head is out and a shoulder dystocia occurs, the option of a Cesarean section no longer exists—the obstetrician is now faced with the need to perform a difficult vaginal delivery, where time is of the essence because the cord is usually compressed by the infant's body in the birth canal and this lack of oxygenation may lead to asphyxiation, brain damage and/or cerebral palsy.

■ Perhaps the most important portion of the expert report, in relation to this issue on appeal, however, contains the following statements made in the conclusion section of Dr. Ferroni's report:

> Dr. Thornton could not have predicted the development of the shoulder dystocia in this patient. When the shoulder dystocia arose, he acted correctly and in a timely fashion to facilitate delivery without compromising the infant's oxygenation who delivered a large, but not excessively large infant. I believe that the child's injury was neither predictable nor preventable according to the records at my disposal.

Based upon Dr. Ferroni's pre-trial report, most notably the above-quoted language in the conclusion section, we are convinced that his direct testimony at the trial was clearly inconsistent with and went beyond the fair scope of his testimony as set forth in his pre-trial expert report. Pa.R.C.P. 4003.5. In his report Dr. Ferroni opines that Kim's entire labor and delivery process, up to the point that Dr. Thornton realized that Brooke was suffering from shoulder dystocia, was virtually unremarkable; he stresses multiple times that Dr. Thornton performed all necessary procedures, responded to all stages of the birthing process in the most proper way, and could in no way have predicted that the baby would have a problem with her shoulders in delivery.

Contrary to his report, at trial Dr. Ferroni testified that throughout the final stages of labor, the baby's health became critical due to an appreciable flux of accelerating and decelerating heartbeats. In sum, he claims that due to the excessive fetal heart rate, the

---

**3.** Shoulder dystocia occurs when the head of baby delivers and then the shoulders and the rest

of the infant's body do not follow suit in an easy routine delivery.

baby was critically in need of oxygenation. It is this lack of oxygen to the fetus that precipitated Dr. Thornton's decision to attempt to expel the baby by using the force of the vacuum extractor. The force exerted by the vacuum is what ultimately caused the shoulders to improperly align, and lead to the damage to the baby's neck nerves.

■ Although we find that Dr. Ferroni's report clearly exceeded the fair scope of his pre-trial report, we are unable to find that the Bradys suffered prejudice or unfair surprise as a result of Dr. Ferroni's trial testimony. The discrepancy between the expert's pre-trial report and his trial testimony was not of a nature that would have prevented the Bradys from preparing a meaningful response, or which would have mislead them as to the nature of the appropriate response. *See Tiburzio–Kelly v. Montgomery,* 452 Pa.Super. 158, 681 A.2d 757 (1996). The Bradys had the benefit of Dr. Thornton's complete office records regarding Kim's care, any and all copies of reports rendered by the defense experts, the defendants' entire claims and investigation files, and any and all records or reports which relate in any way to the subject matter of the underlying medical malpractice action. Most compelling to our decision, however, is the fact that it was Dr. Goldstein, the plaintiff's own expert, who was the first to advance the opinion that Dr. Thornton believed that the baby was in distress and needed immediate extradition from the womb by the use of a vacuum. *See Butler v. Kiwi,* 412 Pa.Super. 591, 604 A.2d 270 (1992) (expert opinion testimony can be founded in part upon the opinions of other experts). Dr. Goldstein testified that Kim had a delivery known as a "precipitous delivery" which indicates that it is going very quickly. Such deliveries increased the baby's risk of shoulder dystocia. His expert report indicated that the neck damage was a result of the use of the vacuum—an "obviously too vigorous" method of gaining traction of the baby's head in an attempt to effectuate delivery. In summary, Dr. Goldstein made the following comments in his expert report:

- The patient was hyperstimulated with Petocin which directly resulted in a pattern of fetal heart rate decelerations.
- The vacuum extraction was done at too high a station that a primary cesarean section was more appropriate.
- Once the head was delivered, traction by vacuum was applied in an undue fashion that resulted in the brachial plexus injury.
- Injury was incurred before Dr. Thornton manually manipulated the baby to free it from its trapped shoulder against the mother's pelvis.
- The difficulty with the shoulder could have been anticipated due to the fact that the baby's head remained so high in spite of the mother pushing in the second stage of labor.

To further demonstrate that the Bradys were not "surprised" by Dr. Ferroni's testimony, we recognize that even the Bradys' expert quoted Dr. Thornton's testimony regarding his decision to accelerate the delivery process by using a vacuum due to his belief that the baby was in fetal distress as evidenced by the rapid heart tracings.

■ Our court has held that "a physician who is also a defendant may testify as a fact witness on his own behalf without the filing of an expert's report." *Havasy,* 415 Pa.Super. at 495, 609 A.2d at 1333 (*citing Neal by Neal v. Lu,* 365 Pa.Super. 464, 530 A.2d 103 (1987)). Fact testimony may include opinion or inferences so long as those opinions or inferences are rationally based on the witness's perceptions and helpful to a clear understanding of his or her testimony. *Id.* (citations omitted). Additionally, an expert may base his or her opinion on facts learned by listening to testimony at trial. *Tobash v. Jones,* 419 Pa. 205, 213 A.2d 588 (1965).

■ Accordingly, we find that it was proper for Dr. Thornton to testify regarding his opinion and judgment of the facts of baby Brooke's delivery and for Dr. Ferroni to comment upon the Brady delivery based upon the facts gleaned from the testimony given by Doctors Thornton and Goldstein. *Havasy, supra; Butler, supra.* By his testimony, Dr. Ferroni was essentially rebutting Dr. Goldstein's opinion that Dr. Thornton had created a hyperstimulated environment

for the fetus as a result of continuing the Petocin longer than he should have throughout Kim's labor. Under these factors, we do not find that the trial court erred in admitting Dr. Ferroni's trial testimony which may have differed from his pre-trial report's conclusions. *See Havasy, supra* (the testimony of defense experts was relevant and admissible to contradict the theory advanced by the plaintiffs-appellants).

Furthermore, this is not a case where Dr. Ferroni made a blanket conclusion that Dr. Thornton was not negligent in his treatment of Kim and then proffered an in-depth theory explaining Doctor Thornton's lack of culpability at trial. *Cf. Jones, supra.* The Bradys cannot claim surprise regarding testimony that their own expert brought up during trial. The purpose behind Rule 4003.5 and the theory of fair scope testimony would not be advanced by reversing the decision of the trial court where no unfair and prejudicial surprise was suffered by appellants; it was up to the jury to determine the weight and credibility of the conflicting testimony proffered by the experts. *Havasy, supra.*

 The Bradys next assert that the trial court erred by precluding them from presenting evidence that Dr. Ferroni was a defendant in a pending medical malpractice action in which Dr. Thornton would be a key defense witness and in which the defendants would be represented by present Appellees/Defendants' attorney, George L. Young, Jr. It is well established that it is permissible to impeach an expert witness by demonstrating that he or she has partiality to a party for whom he or she is testifying. *Grutski v. Kline,* 352 Pa. 401, 43 A.2d 142 (1945). Thus, it is proper to question an expert as to the fee he or she will receive to testify in the case, *Tiburzio–Kelly v. Montgomery,* 452 Pa.Super. at 177, 681 A.2d at 767, or, whether a personal friendship exists between the expert and either the party calling him or that party's counsel. *Downey v. Weston,* 451 Pa. 259, 301 A.2d 635 (1973). *Accord Mohn v. Hahnemann Medical College and Hosp.,* 357 Pa.Super. 173, 515 A.2d 920 (1986). However, the precise degree to which such impeachment cross-examination will be permitted rests in the sound discretion of the trial court. *Smith v. Celotex Corp.,* 387 Pa.Super. 340, 564 A.2d 209 (1989). *See Downey v. Weston,* 451 Pa. 259, 301 A.2d 635 (1973) (the trial court has discretion to determine the point at which further cross-examination would be unproductive and its ruling will not be reversed absent an abuse of discretion).

 After a lengthy in-chambers discussion regarding the permissible scope that the Bradys' counsel would be allowed to cross-examine Dr. Ferroni with regard to his possible bias for the defense, the trial court permitted the following information to be offered at trial:

Q: Dr. Ferroni, it is true, isn't it, that Mr. Young represents you? Isn't that a fact?

A: Mr. Young represents me?

Q: Yes.

A: Yes. That's true.

 We recognize that a professional relationship between experts and defense attorneys, beyond the confines of a present case, may be the proper subject of cross-examination. *Downey, supra.* Accordingly, the trial court properly allowed plaintiff's counsel to elicit the existence of Dr. Ferroni and Attorney Young's professional relationship in another pending case. Furthermore, the trial court properly limited the scope of this cross-examination. In the other pending case defended by Mr. Young, Dr. Ferroni was made a party because one of his medical practice partners was being sued for malpractice. Ferroni was not the treating physician in the case being defended by Young. Accordingly, we do not find this expert-attorney relationship was so intertwined that it should be classified as a personal friendship of the "ongoing" type necessitating more cross-examination than what was permitted. *See Mohn v. Hahnemann Medical College and Hosp.,* 357 Pa.Super. 173, 515 A.2d 920 (1986) (where expert and defense counsel had a financial relationship that spanned almost 12 years and were still actively involved in 30 other cases, plaintiff's counsel was properly permitted to question the expert regarding the expert-attorney relationship).

In fact, we agree with the trial court's sentiment that had counsel been permitted to

elicit the fact that Dr. Ferroni was involved in another medical malpractice case with Dr. Thornton, the bias and harm of such detailed and extensive testimony would clearly outweigh any good that such questioning might produce. *See Mohn*, 357 Pa.Super. at 181, 515 A.2d at 924 ("To exceed the line of inquisition denominated 'relevant' runs the risk of exposing the witness or the party on whose behalf he appears to the danger of being unduly prejudiced."). In recognizing this concern, the learned trial judge carefully limited the questioning of Dr. Ferroni to that information necessary to establish his credibility. *Mohn, supra.* Further cross-examination regarding the unrelated malpractice case and Dr. Thornton's alleged involvement in such case would have been unproductive and likely have served to divert the case into collateral matters that may have confused the jury. *Mohn, supra* (where trial court allowed plaintiff's counsel to question defense expert regarding his receipt of fees for *all* medical-legal cases other than the one being tried, such inquiry was not within "reasonable limits"; court reversed judgment because questions posed were not relevant to establishing witness's credibility). The court did not abuse his discretion. *Celotex, supra.* This issue is meritless.

Order affirmed.

OLSZEWSKI, J., files a Dissenting Opinion.

OLSZEWSKI, Judge, dissenting:

While the expression of the majority view provides a persuasive analysis and sound rationale, I am obliged to differ and respectfully dissent.

First, the majority opinion goes through a thorough analysis of the issue of testimony beyond the "fair scope" of the expert's report and concludes that the defense expert's testimony was beyond the fair scope of his report. Nevertheless, the majority finds that a new trial should not be granted because no prejudice resulted from the violation of this fair scope rule.

The majority admits that Dr. Ferroni's testimony "clearly exceeded the fair scope of his pre-trial report." If the testimony ex-

ceeds the fair scope of his pre-trial report it is not admissible. *See, e.g., Walsh v. Kubiak*, 443 Pa.Super. 284, 661 A.2d 416 (1995); Pa. R.Civ.P. 4003.5(c); *Pascale v. Hechinger Co. of Pa.*, 426 Pa.Super. 426, 627 A.2d 750 (1993).

*Walsh* requires that the pre-trial report allow the opposing side to anticipate the expert's testimony so that one may prepare for cross-examination or provide rebuttal. As noted by the majority, not only was Dr. Ferroni's testimony beyond the scope of his pre-trial report, it was contradictory to that report. Because plaintiff's counsel did not know of this theory as opined by Dr. Ferroni until he was on the witness stand, plaintiff was unable to adequately cross-examine him or prepare rebuttal.

The majority relies on *Tiburzio–Kelly v. Montgomery*, 452 Pa.Super. 158, 681 A.2d 757 (1996), for the proposition that no prejudice occurred because plaintiff should have known that fetal distress was a possible theory of the case. In *Tiburzio–Kelly*, however, the Court stated that the argument presented could actually be gleaned from the reports themselves and therefore no prejudice occurred. In the instant case, Dr. Ferrino's testimony could not have been gleaned from his pre-trial report as his report was silent as to the fetal distress theory and actually contradicted that theory.

Clearly, plaintiff was adversely prejudiced by the testimony given by Dr. Ferroni as it went beyond the fair scope of his pretrial report. A new trial should therefore be granted.

Next, the majority finds that the lower court properly restricted the cross-examination of the defense expert as to possible bias in his testimony. Plaintiff was not allowed to question Dr. Ferroni as to his professional relationship with the defendant Dr. Thornton and with defendant's counsel. Evidence of such relationships is highly relevant to the case and clearly admissible. *See Tiburzio–Kelly, supra,* 681 A.2d at 767; *Downey v. Weston,* 451 Pa. 259, 301 A.2d 635 (1973). The trial court has within its discretion the power to limit such cross-examination to prevent it from becoming unproductive. *Dow-*

*ney, supra.* In the instant case, however, I feel that the trial court clearly abused its discretion in limiting the cross-examination as to such bias in the instant case.

In *Downey,* the Court found the limitation on cross-examination permissible as counsel sought to discredit credibility by showing past misconduct by the witness. In the instant case, however, plaintiff wanted to impeach credibility by showing *bias* that existed on the part of this expert witness. The bias in this case is rather significant as the doctor accused of malpractice in the instant case is the leading witness in a medical malpractice suit against Dr. Ferroni's own medical partnership. Additionally, defendant's counsel was representing Dr. Ferroni in that medical malpractice suit. These allegations of bias are quite important and highly relevant to the expert's motivation and credibility as a witness. The believability of an expert witness in a medical malpractice suit is crucial to the determination of liability. Therefore, the trial court should not have so severely limited the cross-examination of the expert on such important matters of bias. Plaintiff was clearly harmed by the trial court's ruling on limiting this cross-examination. Therefore, a new trial should be granted.