**Klaus v. Kirkland**

*Glenn A. Ellis,* for plaintiffs.
*Daniel Rovner,* for defendants Carrasquillo and P.H.G.I. Associates, Ltd.

QUIÑONES ALEJANDRO, *J.,* August 12, 2010—

## INTRODUCTION

This matter involves a medical professional liability action brought by Patricia Klaus (plaintiff-Wife) and Herbert Hoffman (plaintiff-Husband) against numerous physicians and affiliated healthcare institutions accused of negligence for failing to diagnose and/or treat plaintiff-Wife's chronic diarrhea and rectal bleeding. The individual physicians and healthcare providers sued were: Matt L. Kirkland M.D., Pennsylvania Hospital, Trustees of the University of Pennsylvania, Frankford Hospital Bucks County Campus, Joseph E. Kemizian M.D., William L. Kliefoth Jr. D.O., Jose R. Carrasquillo M.D., and P.H.G.I. Associates Ltd.

A review of the official record (docket) reveals that this matter was originally scheduled for trial before the Honorable John M. Younge. However, by order dated December 8, 2008, Judge Younge remanded the case to the compulsory arbitration program.[1] On March 31, 2009, an arbitration panel issued a finding in favor of all defendants and against plaintiffs. Thereafter, on April 9, 2009, plaintiffs filed an appeal and requested a de novo jury trial.

On March 20, 2010, following a seven-day trial, the jury rendered a verdict in favor of defendants Dr. Carrasquillo and P.H.G.I. Associates and against plaintiffs

---

1. Philadelphia Civil Rule *1301, et seq., essentially provides that cases valued at less than $50,000 must be commenced in the compulsory arbitration program and are appealable to the major trial program for a jury trial de novo, only after an arbitration panel has rendered its findings.

finding that defendant Dr. Carrasquillo did not breach the applicable standard of care.[2]

Dissatisfied, plaintiffs filed this appeal contending that the undersigned trial judge erred in permitting expert opinion testimony and/or in charging the jury. This trial judge disagrees and, for the reasons stated herein, respectfully recommends that this appeal be dismissed.

## FACTUAL HISTORY

At trial, the following evidence was presented:

In 2003, plaintiff-Wife underwent a Roux-en-Y gastric bypass surgery performed by Dr. Kirkland at Pennsylvania Hospital.[3]

Following this gastric bypass surgery, plaintiff-wife did relatively well until February 27, 2005, when she awoke with severe abdominal pain.[4] She was taken to Pennsylvania Hospital and was diagnosed with a volvulus, a 360 degrees twisting of the small bowel that had been connected to her stomach during the bypass surgery.[5] On February 28, 2005, Dr. Kirkland performed a resection surgery and amputated the segment of the twisted colon while still maintaining the gastric bypass.[6]

---

2. Plaintiffs settled with all other defendants prior to the commencement of trial, Defendant P.H.G.I. Associates remained in this case on a vicarious liability theory claim.

3. N.T. 3/2/2010 p.m. at 74-75; N.T. 3/3/2010 p.m. at 77, 81-82; N.T. 3/5/2010 p.m. at 6, 36.

4. N.T. 3/3/2010 p.m. at 82-84, 91, 93; N.T. 3/5/2010 p.m. at 42; N.T. 3/8/2010 a.m. at 65-66.

5. N.T. 3/2/2010 p.m. at 76-77; N.T. 3/3/2010 p.m. at 94, 96; N.T. 3/5/2010 p.m. at 43-44; N.T. 3/8/2010 p.m. at 57-58.

6. N.T. 3/2/2010 a.m. at 84; N.T. 3/2/2010 p.m. at 65, 77, 81; N.T. 3/3/2010 p.m. at 95; N.T. 3/5/2010 p.m. at 44-45; N.T. 3/8/2010 a.m. at 67; 3/8/2010 p.m. at 58.

She was discharged from Pennsylvania Hospital on March 4, 2005.[7] Thereafter, plaintiff-Wife suffered constant abdominal pain and chronic diarrhea.[8]

On March 24, 2005, plaintiff-Wife experienced an onset of severe rectal bleeding and syncope.[9] She was taken by ambulance to the emergency room at Frankford Hospital and later, that same day, was transferred to Pennsylvania Hospital.[10] Several tests were performed upon her admission, including measurements of her vitamin K levels—a biochemical agent responsible for promoting blood coagulation.[11] Critical to this appeal is an understanding of the impact of a patient's blood levels of vitamin K; *i.e.*:

"When appropriate, physicians order a blood test referred to as the international normalized ratio (INR) to measure the blood's ability to coagulate.[12] A patient with a normal amount of vitamin K in the bloodstream will have an INR measurement between 0.8 and 1.2.[13] An INR value above 1.2 reflects an insufficient amount of vitamin K making the patient prone to bleed excessively because the blood is not coagulating as effectively."[14]

---

7. N.T. 3/3/2010 p.m. at 98; N.T. 3/8/2010 a.m. at 67.

8. N.T. 3/3/2010 p.m. at 98-101; N.T. 3/5/2010 p.m. at 45; N.T 3/8/2010 a.m. at 68-69.

9. N.T. 3/3/2010 p.m. at 101, 103-104; N.T. 3/4/2010 a.m. at 80; N.T 3/8/2010 a.m. at 70-71.

10. N.T. 3/3/2010 p.m. at 104-105; N.T. 3/4/2010 a.m. at 80; N.T. 3/5/2010 p.m. at 47-48; N.T. 3/8/2010 a.m. at 70-71.

11. N.T. 3/3/2010 p.m. at 16.

12. N.T. 3/2/2010 a.m. at 126, 163; N.T. 3/3/2010 a.m. at 68-71; N.T. 3/4/2010 a.m. at 141-42.

13. N.T. 3/2/2010 a.m. at 163; N.T. 3/3/2010 a.m. at 71; N.T. 3/3/2010 p.m. at 47-48; N.T. 3/4/2010 a.m. at 143; N.T. 3/9/2010 a.m. at 73.

14. N.T. 3/2/2010 a.m. at 126, 139, 150.

Plaintiff-wife's vitamin K test results showed that she had an elevated INR measurement of 1.4[15] and, accordingly, was administered a vitamin K injection. Under normal circumstances, this supplement was expected to remain in the body for up to one month and synthetically increase her vitamin K levels.[16] Subsequent blood studies drawn on March 26th and March 28th showed normal INR measurements of 1.2.[17]

It was during this admission at Pennsylvania Hospital that defendant Dr. Carrasquillo, a gastroenterologist employed by defendant P.H.G.I. Associates,[18] first became involved to plaintiff-Wife's care. He was called in as a consultant to investigate the cause of her abdominal pain, diarrhea and rectal bleeding.[19] On March 30, 2005, defendant Dr. Carrasquillo, inter alia, performed an upper endoscopy which revealed a normal esophagus with no bleeding;[20] and biopsied small bowel and stomach samples which were found to be normal except for signs of gastritis.[21] On March 31, 2005, Dr. Kirkland discharged plaintiff-Wife from the

15. N.T. 3/2/2010 a.m. at 163; N.T. 3/3/2010 a.m. at 71; N.T. 3/3/2010 p.m. at 35, 45; N.T. 3/4/2010 a.m. at 142-43.

16. N.T. 3/2/2010 a.m. at 133; N.T. 3/3/2010 p.m. at 35-36; N.T. 3/4/2010 a.m. at 144.

17. N.T. 3/2/2010 a.m. at 163-64; N.T. 3/3/2010 a.m. at 71-72; N.T. 3/3/2010 p.m. at 35, 46; N.T. 3/4/2010 a.m. at 145.

18. N.T. 3/8/2010 p.m. at 98.

19. N.T. 3/2/2010 a.m. at 84-86; N.T. 3/3/2010 p.m. at 108; N.T. 3/4/2010 a.m. at 17-18, 81; N.T. 3/5/2010 p.m. at 55-56; N.T. 3/8/2010 a.m. at 71-72; N.T. 3/8/2010 p.m. at 59; N.T. 3/9/2010 a.m. at 4-5.

20. N.T. 3/4/2010 a.m. at 81; N.T. 3/5/2010 p.m. at 57-58; N.T. 3/9/2010 a.m. at 18-22.

21. N.T. 3/4/2010 a.m. at 81, 86-88; N.T. 3/5/2010 p.m. at 57-58; N.T. 3/9/2010 a.m. at 22-25.

hospital without seeking further input from defendant Dr. Carrasquillo.[22]

Surprised by plaintiff-Wife's discharge, defendant Dr. Carrasquillo called plaintiff-Wife at home and scheduled her for a follow-up appointment.[23] On April 4, 2005, plaintiff-Wife kept the appointment with defendant Dr. Carrasquillo and was readmitted that same day into Pennsylvania Hospital under his care.[24] During this second admission, plaintiff-Wife underwent a colonoscopy which showed some diverticula but no other significant findings;[25] an upper endoscopy which showed no active bleeding;[26] and a small bowel study which showed one or two loops of small bowel with mild focal thickening and nodularity.[27] Blood samples were drawn on April 5th, 7th and 9th and were found to have normal INR measurements of 1.2, 1.1 and 1.0, respectively.[28] Plaintiff-

22. N.T. 3/2/2010 a.m. at 90; N.T. 3/4/2010 a.m. at 19-20, 22, 88-89; N.T. 3/5/2010 p.m. at 58; N.T. 3/8/2010 a.m. at 73-75; N.T. 3/8/2010 p.m. at 59-61; N.T. 3/9/2010 a.m. at 26-27.

23. N.T. 3/2/2010 a.m. at 91; N.T. 3/4/2010 a.m. at 24-26, 89; N.T. 3/5/2010 p.m. at 58-59; N.T. 3/8/2010 a.m. at 77-79; N.T. 3/8/2010 p.m. at 60; N.T. 3/9/2010 a.m. at 27-31.

24. N.T. 3/2/2010 a.m. at 91-94; N.T. 3/4/2010 a.m. at 35-39, 89-90; N.T. 3/5/2010 a.m. at 4-5; N.T. 3/5/2010 p.m. at 59-60; N/T. 3/8/2010 a.m. at 80-81, 83-84, 87-88; N.T. 3/8/2010 p.m. at 61; N.T. 3/9/2010 a.m. at 31-32.

25. N.T. 3/4/2010 a.m. at 90; N.T. 3/5/2010 p.m. at 61; N.T. 3/9/2010 a.m. at 34-41, 75-76.

26. N.T. 3/4/2010 a.m. at 97-98; N.T. 3/5/2010 a.m. at 27; N.T. 3/9/2010 a.m. at 48-50.

27. N.T. 3/3/2010 a.m. at 47; N.T. 3/4/2010 a.m. at 98-99; N.T. 3/5/2010 p.m. at 63; N.T. 3/9/2010 a.m. at 54-55, 76.

28. N.T. 3/2/2010 a.m. at 164-65; N.T. 3/3/2010 a.m. at 72-73; N.T. 3/3/2010 p.m. at 48; N.T. 3/4/2010 a.m. at 145-46; N.T. 3/9/2010 a.m. at 72-74.

Wife had an episode of rectal bleeding on or about April 6, 2005,[29] and was stabilized. She was subsequently discharged from the hospital on April 13, 2005.[30]

On April 25, 2005 and May 16, 2005, plaintiff-Wife had out-patient follow-up visits with defendant Dr. Carrasquillo to determine the cause of her abdominal pain, diarrhea, and rectal bleeding.[31] During these visits, defendant Dr. Carrasquillo performed additional studies which were unremarkable, except for a stool sample study which could not rule out bacterial overgrowth, pancreatic insufficiency or short bowel syndrome.[32] To treat these potential conditions, plaintiff-Wife was started on medications and referred to a nutritionist.[33] In addition, defendant Dr. Carrasquillo recommended to plaintiff-Wife that she schedule a double-balloon enteroscopy.[34] This procedure was per-

---

29. N.T. 3/2/2010 a.m. at 98, 136-37, 152-53; N.T. 3/4/2010 a.m. at 101-102; N.T. 3/5/2010 a.m. at 9-11; N.T. 3/8/2010 a.m. at 89-90, 93-94; N.T. 3/9/2010 a.m. at 48.

30. N.T. 3/2/2010 a.m. at 97; N.T. 3/4/2010 a.m. at 102; N.T. 3/5/2010 a.m. at 13; N.T. 3/8/2010 a.m. at 91, 93; N.T. 3/9/2010 a.m. at 65-66.

31. N.T. 3/2/2010 a.m. at 98-99; N.T. 3/4/2010 a.m. at 104-105; N.T. 3/5/2010 a.m. at 20-21, 39; N.T 3/5/2010 p.m. at 67-68, 70, 84-85; N.T. 3/8/2010 a.m. at 98-99; N.T. 3/9/2010 a.m. at 74-75, 99.

32. N.T. 3/2/2010 a.m. 98-104; N.T. 3/4/2010 a.m. at 105-10, 114-20, 127-29; N.T. 3/5/2010 a.m. at 29-33, 38-39, 45; N.T. 3/5/2010 p.m. at 68-70; N.T. 3/8/2010 a.m. at 93, 101-105; N.T. 3/9/2010 a.m. at 100-105.

33. N.T. 3/2/2010 a.m. at 108; N.T. 3/3/2010 a.m. at 51-54, 101-105, 112-13; N.T. 3/4/2010 a.m. at 115-29; N.T. 3/4/2010 p.m. at 66, 80-88, 100-101; N.T. 3/5/2010 p.m. at 72-74; N.T. 3/9/2010 a.m. at 105-109.

34. N.T. 3/3/2010 a.m. at 39-40; N.T. 3/4/2010 a.m. at 129-31; N.T. 3/5/2010 a.m. at 27-28; N.T. 3/5/2010 p.m. at 74-75, 84-85; N.T. 3/9/2010 a.m. at 111-14.

formed by Jeffery Tokar M.D., at Fox Chase Cancer Center, on July 1, 2005, which did not show a bleeding site or the cause of plaintiff-Wife's diarrhea.[35]

In the interim, blood samples were taken on April 20, 2005, May 2, 2005 and May 25, 2005, to determine the vitamin K levels and these samples revealed normal INR measurements of 1.1, 1.0 and 1.0, respectively.[36]

On July 14, 2005, plaintiff-Wife consulted with William Lipshutz M.D., defendant Dr. Carrasquillo's senior colleague, for his perspective on her ongoing medical problems. Following the review of all the test results, Dr. Lipshutz recommended, inter alia, that plaintiff-Wife see a nutritionist and/or meet with Dr. Kirkland to discuss a possible reversal of the gastric bypass surgery.[37]

On August 16, 2005, the last date he had any contact with plaintiff-Wife,[38] defendant Dr. Carrasquillo discussed with her, during a telephone conversation, Dr. Lipshutz' recommendations."[39]

On September 2, 2005, plaintiff-Wife had a bloody bowel movement and was taken to the emergency room

35. N.T. 3/2/2010 a.m. at 106; N.T. 3/3/2010 a.m. at 33-38; N.T. 3/4/2010 a.m. at 132-33; N.T. 3/5/2010 a.m. at 70, 100; N.T. 3/5/2010 p.m. at 78-79, 81-82; N.T. 3/9/2010 p.m. at 19-23.

36. N.T. 3/3/2010 a.m. at 73-76; N.T. 3/3/2010 p.m. at 48-49; N.T. 3/4/2010 a.m. at 146-47.; N.T. 3/9/2010 p.m. at 97-98.

37. N.T. 3/2/2010 a.m. at 108; N.T. 3/3/2010 a.m. at 28-31, 112-13, 115; N.T. 3/4/2010 a.m. at 133-36; N.T. 3/5/2010 a.m. at 69-70, 80-90; N.T. 3/5/2010 p.m. at 86-93; N.T. 3/8/2010 a.m. at 115-23; N.T. 3/8/2010 p.m. at 68-70; N.T. 3/9/2010 p.m. at 28-31.

38. N.T. 3/2/2010 a.m. at 86, 89, 146, 166-67; N.T. 3/3/2010 a.m. at 32-33, 78, 82, 115-16; N.T. 3/4/2010 a.m. at 137; N.T. 3/5/2010 a.m. at 118-19; N.T. 3/5/2010 p.m. at 98-99; N.T. 3/9/2010 p.m. at 49-51.

39. N.T. 3/2/2010 a.m. at 89; N.T. 3/3/2010 a.m. at 31-32, 114-15; N.T. 3/4/2010 a.m. at 136; N.T. 3/5/2010 p.m. at 93, 97-98; N.T. 3/9/2010 p.m. at 43-44.

at Frankford Hospital.[40] She arrived at 3:50 a.m. and was discharged approximately 11 hours later at 2:52 p.m. after the bleeding had subsided.[41] A vitamin K blood study performed during this hospital visit revealed a normal INR measurement of 0.8.[42]

On September 9, 2005, plaintiff-Wife sustained another episode of severe rectal bleeding and was admitted into Frankford Hospital.[43] Shortly after her admission, blood work was done at 6:05 p.m., and her vitamin K levels were found to be normal with an INR measurement of 1.0.[44]

On September 10, 2005, after having undergone an upper endoscopy procedure,[45] plaintiff-Wife suffered a massive bleed and coded at 3:40 a.m. Blood products consisting of 12 units of packed red blood cells, two units of platelets, and six units of plasma were emergently transfused into her until approximately 6:53 a.m.[46] A blood study performed at 7 a.m., revealed an elevated INR measurement of 1.5.[47]

---

40. N.T. 3/5/2010 a.m. at 126-27; N.T. 3/8/2010 p.m. at 14-17.

41. N.T. 3/8/2010 a.m. at 9; N.T. 3/8/2010 p.m. at 73-74.

42. N.T. 3/2/2010 a.m. at 144; N.T. 3/3/2010 a.m. at 77-78.

43. N.T. 3/2/2010 p.m. at 39; N.T. 3/3/2010 a.m. at 59, 79; N.T. 3/5/2010 a.m. at 124-26, 128; N.T. 3/5/2010 p.m. at 115; N.T. 3/8/2010 p.m. at 17, 18-22.

44. N.T. 3/2/2010 a.m. at 144-50, 167-68; N.T. 3/3/2010 a.m. at 79; N.T. 3/3/2010 p.m. at 50; N.T. 3/4/2010 p.m. at 5-6.

45. N.T. 3/2/2010 p.m. at 40; N.T. 3/3/2010 a.m. at 59; N.T. 3/4/2010 p.m. at 7-9.

46. N.T. 3/2/2010 p.m. at 40; N.T. 3/3/2010 a.m. at 82; N.T. 3/3/2010 p.m. at 6; N.T. 3/4/2010 p.m. at 10-16, 42; N.T. 3/5/2010 a.m. at 127, 128; N.T. 3/8/2010 p.m. at 23.

47. N.T. 3/2/2010 p.m. at 40, 146-47; N.T. 3/3/2010 p.m. at 38, 52; N.T. 3/4/2010 a.m. at 6, 17; N.T. 3/4/2010 p.m. at 40-41.

During this hospitalization, Robert Golub M.D., operated on plaintiff-Wife and identified the bypassed nonfunctional portion of her stomach as the source of her long-standing off-and-on internal bleeding.[48] Undisputedly, this area of bleeding could not be visualized by any of the scope examinations performed by defendant Dr. Carrasquillo and/or Dr. Takar at Fox Chase Cancer Center.[49] Dr. Golub was able to correct the underlying problem and the bleeding subsided.[50]

## ISSUES

In response to an order issued on June 19, 2010, in accordance with Pa.R.A.P. 1925(b), plaintiffs on July 13, 2010, filed of record and served onto this trial judge the following verbatim statement of errors complained of on appeal:

"(1) The court erred in allowing the defendant's expert, Dr. Thornton to testify as to a causation theory that was not in his expert report.

"(2) The court erred in instructing the jury that they could not find that defendant, Dr. Carrasquillo's failure to prescribe TPN was an act of negligence."

## LAW AND DISCUSSION

Plaintiffs' appellate issues are similar to the issues raised in their post-trial motion which was denied; to wit:

---

48. N.T. 3/3/2010 a.m. at 87-88; N.T. 3/3/2010 p.m. at 6; N.T. 3/4/2010 p.m. at 21-22, 124.

49. N.T. 3/3/2010 a.m. at 87-88; N.T. 3/4/2010 p.m. at 22-23.

50. N.T. 3/5/2010 a.m. at 92-96; N.T. 3/8/2010 p.m. at 37-38.

this trial judge erred in admitting certain portions of the expert opinion testimony and/or in charging the jury. This trial judge disagrees.

Initially, a new trial is warranted to achieve justice in those instances where the original trial was tainted, unfair, or marred by error. *Harman v. Borah,* 562 Pa. 455, 466, 756 A.2d 1116, 1121 (2000). In deciding whether a new trial should be granted, the court must decide whether one or more factual and/or legal mistakes occurred at trial and, if a mistake(s) occurred, whether the mistake is a sufficient basis for granting a new trial. *Id.* at 467, 756 A.2d at 1122. However, a new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently. *Id.* Rather, the moving party must have suffered prejudice from the mistake. *Id.* In making its determination, the trial court must consider, viewing the evidence in the light most favorable to the verdict winner, whether a new trial would produce a different verdict. *J.W.S. Delavau Inc. v. Eastern America Transport & Warehousing Inc.,* 810 A.2d 672, 680 (Pa. Super. 2002).

Absent a clear abuse of discretion, the decision to grant or deny a new trial is within the sound discretion of the trial court. *Harman,* 562 Pa. at 466, 756 A.2d at 1121. A trial court abuses its discretion if, in resolving the issue, it misapplies the law, or exercises its discretion in a manner lacking reason. *Pohl v. NKG Metals Corporation,* 936 A.2d 43, 49 (Pa. Super. 2007). It follows that if there is any support in the record for the trial court's decision to grant or deny the request for a new trial, the trial court's ruling must be affirmed. *J.W.S.,* 810 A.2d at 680.

In plaintiffs' first appellate issue, they contend that prejudicial error was committed in allowing defense expert, James J. Thornton M.D., to offer a causation theory that purportedly went beyond the fair scope of his two expert reports. A careful review and comparison of the expert reports with trial testimony belies this contention.

It is well-established that the admission of expert testimony is a matter of discretion for the trial court and will not be remanded, overruled, or disturbed unless there is a clear abuse of discretion. *Rettger v. UPMC Shadyside,* 991 A.2d 915, 930 (Pa. Super. 2010). Particularly relevant is Pa.R.C.P. 4003.5(c) which prohibits an expert from presenting evidence at trial that exceeds the fair scope of the expert's report; to wit:

"(c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings . . . , the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings."

In determining whether an expert's trial testimony falls within the fair scope or the four corners of the pretrial report, the trial court must ascertain whether the report provides sufficient notice of the expert's theory to enable

14

the opposing party to prepare a rebuttal witness. *Brodowski v. Ryave,* 885 A.2d 1045, 1065 (Pa. Super. 2005). The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and the trial testimony is of a nature which would prevent the adversary from making a meaningful response, or which would mislead the adversary as to the nature of the appropriate response. *Id.*

Notwithstanding, a trial court may permit an expert in a medical malpractice action to offer testimony that exceeds the fair scope of the report if such testimony is derived from the plaintiff-patient's medical records and it is apparent that the testimony is not of a nature that would have prevented the opposing party from preparing a meaningful response. See *Brady v. Ballay, Thornton, Maloney Medical Associates Inc.,* 704 A.2d 1076, 1082 (Pa. Super. 1997).

Instantly, on September 9, 2005, plaintiff-Wife was rushed by ambulance to Frankford Hospital for severe gastrointestinal bleeding. Plaintiffs' expert, Gerald Salen M.D., opined that the initial bleeding which necessitated her emergency admission (as differentiated from the later post-upper endoscopy bleed) was caused by a long-standing undiagnosed vitamin K deficiency which resulted in malabsorption, purportedly a side effect of plaintiff-Wife's prior gastric bypass and/or volvulus surgeries.[51] Dr. Salen further opined that defendant Dr. Casrasquillo was causally negligent in failing to diagnose and treat this vitamin K deficiency. On cross-examination, however, Dr. Salen admitted that the blood studies

---

51. N.T. 3/2/2010 p.m. at 40-41.

performed at Frankford Hospital confirmed that plaintiff-Wife did not have a vitamin K deficiency at the time of her admission on September 9, 2005, and that *something* occurred—probably the code and the subsequent blood transfusions—overnight which caused plaintiff-Wife's vitamin K levels to slightly decrease.[52] Dr. Salen also acknowledged that this event transpired approximately one month after plaintiff-Wife was last seen by defendant Dr. Carrasquillo.

Conversely, it was defendant Dr. Carrasquillo's belief that plaintiff-Wife's long-standing off-and-on rectal bleeding resulted from an injury to the bypassed portion of her stomach which he was incapable of visualizing via either the upper endoscopy, colonoscopy, sigmoidoscopy. In addition, his expert Dr. Thornton, a gastroenterologist, disagreed with Dr, Salen and opined that plaintiff-Wife's vitamin K levels were normal each time these studies were performed except for the September 10th study, done after she coded and received blood transfusions.

During the presentation of plaintiff's expert's (Dr. Salen) testimony, counsel for plaintiffs made an oral motion to preclude Dr. Thornton from discussing the "mysterious event" (a term coined by plaintiffs) referenced during Dr. Salen's cross-examination because there was no mention of any "mysterious event" in either of Dr. Thornton's expert reports. This trial judge opined that the motion was premature and deferred ruling on the question until such time defendants would attempt to elicit the testimony from their expert.[53]

---

52. N.T. 3/3/2010 a.m. at 79-82.
53. N.T. 3/4/2010 a.m. at 4-12.

During the presentation of their expert, defendants were permitted to question Dr. Thornton regarding the events of plaintiff-Wife's care on September 9-10, despite plaintiffs' objection, since the testimony being offered was similar to the cross-examination testimony elicited from Dr. Salen. Specifically, Dr. Thornton explained that he reviewed Frankford Hospital's emergency room record of September 9, 2005, regarding plaintiff-Wife's admission and subsequent care. These records revealed that she had a blood study test done at 6:05 p.m. which was found to have a normal INR measurement of 1.0.[54] His review of the record also revealed that between the hours of 1:45 a.m. and 3 a.m., on September 10, 2005, plaintiff-Wife underwent an upper endoscopy and sometime later, suffered a massive bleed.[55] Dr. Thornton explained that in an effort to stabilize her condition, she was transfused with 12 units of packed red blood cells, two units of platelets, and six units of plasma. After these transfusions, plaintiff-Wife's vitamin K blood level was tested at 7 a.m. and was found, for the first time during her hospitalization, to have an abnormal INR level of 1.5.[56] Based upon these events, Dr. Thornton opined that the slightly elevated INR measurement was due to the blood product transfusions.[57]

In this trial judge's opinion, Dr. Thornton's painstaking review of the medical records was crafted (a) to rebut Dr. Salen's causation theory that at the time of her September 9th hospital admission plaintiff-Wife had an undiagnosed vitamin K deficiency, and (b) to highlight

54. *Id.* at 5-6.
55. *Id.* at 6-11.
56. *Id.* at 6, 17.
57. *Id.* at 17-20.

for the jury the fact that the medical personnel at Frankford Hospital did not find that plaintiff-Wife's blood studies results revealed abnormal INR measurements.[58] Clearly, Dr. Thornton's careful dissection of the medical events is fair grounds for opinion testimony. This objected to testimony or the "mysterious event" referenced was basically a recitation of the events that transpired prior to and during plaintiff-Wife's September 2005 hospitalization at Frankford Hospital. Since plaintiffs were in possession of her medical records long before this matter went to trial, it is evident that plaintiffs had sufficient opportunity to anticipate this line of questioning and prepare a meaningful response. In light of the holding in *Brady, supra,* plaintiffs knew or should have known everything that occurred during her September 2005 hospitalization and could not plausibly have been taken off guard by the evidence and/or explanation. Under the circumstances no error was committed.

Plaintiffs further contend that Dr. Thornton did not reference in either of his reports that a "mysterious event" occurred in the early hours of September 10, 2005, which caused plaintiff-Wife to have an increased INR measurement. In a pertinent part of Dr. Thornton's supplemental expert opinion dated October 26, 2009, the following appears:

"Mrs. Klaus indeed did have significant gastrointestinal bleeding from the bypassed stomach but there is absolutely no evidence that this was related to vitamin K deficiency as the plaintiff's expert states. In fact, the measurement of vitamin K function, the Prothrombin

---

58. *Id.*

time or the INR was normal from March 24th [sic], 2005 through February 2006 measured eight different times. She subsequently developed venous thrombosis (clots) of the upper extremity venous system. She was placed on Coumadin to anti-coagulate her but she subsequently had to see a hematologist, Marc Radbill M.D., because of difficulty in obtaining a therapeutic INR. In other words, her coagulation system was actually hyperco-agulable and the use of vitamin K could have conceivably made this even worse. *There was absolutely never any evidence that she was deficient in vitamin K, and this had no effect on her gastrointestinal bleeding.*" October 2, 2009 report of James J Thornton MD. at 2. (emphasis added)

Although the above-cited passage does not specifi-cally mention the term "mysterious event" or that one occurred which could account for plaintiff-Wife's pre-hospitalization bleed or her past-upper endoscopy bleed, the four corners of the expert report clearly place plain-tiffs on notice that Dr. Thornton was challenging their expert's causation theory that plaintiff-Wife suffered from a vitamin K deficiency. The report unequivocally indicates that she had normal INR measurements through February 2006, four months after her September 2005 hospitalization and six months after defendant Dr. Car-rasquillo treated her. The objectionable expert testimony, in this trial judge's opinion, provided the factual predicate for Dr. Thornton's opinions, a recitation of the events that transpired during those critical hours, and an expla-nation of the medical objective findings. No error was committed in permitting this testimony.

Notwithstanding and assuming arguendo that error was committed in allowing this portion of Dr. Thornton's

opinion testimony, this trial judge opines that such error was harmless and not prejudicial. As discussed, substantially similar testimony had been admitted *without* objection during the cross-examination of plaintiffs' own expert, Dr. Salen. Further, the argument is considered moot since the jury did not reach the issue of causation having ceased its deliberations after finding that defendant Dr. Carrasquillo did not breach the applicable standard of care. In this trial judge's opinion, this appellate issue is without merit.

### *Jury Instruction*

In their second appellate issue, plaintiffs argue that it was prejudicial error to charge the jury that defendant Dr. Carrasquillo's decision *not to order* total parental nutrition (TPN) *was not* negligence. This trial judge disagrees.

It is well-established that a trial court must charge the jury on the correct legal principles applicable to the facts presented at trial. *Gaudio v. Ford Motor Company,* 976 A.2d 524, 550 (Pa. Super. 2009), *allocatur denied,* 989 A.2d 917 (Pa. 2010). In doing so, the trial court has wide latitude in choosing the precise language of the charge, but in all circumstances, the court must fully and adequately convey the applicable law to the jury. *Id.* If the trial court, however, commits a clear abuse of discretion and/or an error of law that affected the outcome of the case, a new trial is warranted. That is:

"Error in [the trial judge's charge or instructions to the jury] is sufficient ground for a new trial if the charge, as a whole, is inadequate, not clear, or has a tendency to mislead or confuse the jury rather than clarify a mate-

rial issue. A charge will be found adequate, unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said, or unless there is an omission in the charge which amounts to a fundamental error. In reviewing [a charge, the court] must look to the charge in its entirety." *Underwood v. Wind,* 954 A.2d 1199, 1204 (Pa. Super. 2008).

Instantly, the purpose of TPN is to administer intravenous nutrition to patients whose gastrointestinal tracts are nonfunctional.[59] Generally, TPN is more serious than ordinary forms of intravenous nutrition because TPN must be provided with a port-catheter combination and can involve serious risks of complications, including blood clots and liver disease.[60] TPN was administered to plaintiff-Wife *only* during her hospitalization of September 2005.

At trial, plaintiffs tried to adduce testimony from Dr. Salen to suggest that defendant Dr. Carrasquillo deviated from the applicable standard of care in not providing TPN supplemental nutrition to plaintiff-Wife. Essentially, plaintiffs attempted to argue that the utilization of TPN would have provided plaintiff-Wife with nutrition needed to combat her malabsorption and/or provide an opportunity for her digestive system to heal. Defendants objected to this line of questioning since it exceeded the fair scope or four corners of Dr. Salen's report. This trial judge agreed and sustained the objections.[61] Notwithstanding, plaintiffs were permitted to introduce

59. N.T. 3/9/2010 p.m. at 44-45.

60. N.T. 3/4/2010 p.m. at 122-23, 128; 3/5/2010 a.m. at 77-78; N.T. 3/5/2010 p.m. at 124-25; N.T. 3/9/2010 p.m. at 45-46.

61. N.T. 3/2/2010 p.m. at 55; N.T. 3/3/2010 p.m. at 30-31.

evidence that plaintiff-Wife should have been given some less drastic form(s) of supplemental nutrition.[62]

Following the close of plaintiffs' case-in-chief, defendants moved for compulsory non-suit on numerous grounds, including inter alia that the jury could not find defendant Dr. Carrasquillo negligent for *not* ordering TPN because said allegation was not supported by the expert report or testimony. This trial judge agreed and granted that portion of the motion.[63] Accordingly, counsel for defendants drafted a jury charge which was incorporated in the jury instructions given. This jury instruction essentially provided that defendant Dr. Carrasquillo's decision not to order TPN could not be a basis for a finding that he breached the standard of care. Over plaintiffs' objection, the charge, as prepared, was read to the jury.[64]

On appeal, plaintiffs argue that this trial judge committed prejudicial error in so charging because adequate evidence was presented to suggest that defendant Dr. Carrasquillo breached the standard of care by not ordering TPN. In support for this contention, plaintiffs primarily cite to their expert's opinion wherein he stated that plaintiff-Wife should have been provided with *non*-TPN based supplemental nutrition. See Memorandum in support of plaintiffs' motion for post-trial relief at 6-7. Plaintiffs also cite to testimony offered by defense expert, Dr. Thornton, wherein he opined that it is easy in retrospect to theorize that defendant Dr. Carrasquillo could

---

62. N.T. 3/2/2010 p.m. at 55-56, 58-59; N.T. 3/3/2010 p.m. at 27-28; N.T. 3/9/2010 p.m. at 64, 67-68, 125-26.

63. N.T. 3/8/2010 p.m. at 112-18, 121, 123.

64. N.T. 3/10/2010 p.m. at 33-34.

22

have administered TPN to plaintiff-Wife prior to her September 9th hospitalization. *Id.* at 1-8. It is noted, however, Dr. Thornton never testified that defendant Dr. Carrasquillo's decision not to provide TPN was negligence.[65] Considering the basis for these arguments, this trial judge opines that plaintiffs' reliance is misplaced and their argument is without merit.

It is axiomatic that to establish a prima facie claim for medical negligence, the plaintiff-patient must introduce expert testimony that the defendant-physician owed the plaintiff a duty of care, that the defendant breached said duty, that the breach was the proximate cause of the harm suffered, and that plaintiff suffered damages as a result of the physician's harm. *Toogood v. Owen J. Rogal D.D.S. P.C.,* 573 Pa. 245, 254-55, 824 A.2d 1140, 1145 (2003). In careful review of the evidence reveals that plaintiffs did not meet their required burden of proof. There was no credible expert testimony provided that established that defendant Dr. Carrasquillo deviated from the applicable standard of care and/or increased plaintiff-Wife's risk of harm by failing to provide her with TPN supplement.

In addition, it appears that plaintiffs' only challenge is to the jury instruction itself and *not* to the granting of the motion for compulsory non-suit or to the preclusion of the portion of Dr. Salen's expert testimony regarding the administration of TPN. Relying on the accuracy of this interpretation, this trial judge further opines that plaintiffs have waived this appellate issue for failure to have preserved an objection to the non-suit ruling.

---

65. See N.T. 3/4/2010 p.m. at 121-23.

## CONCLUSION

Based on the foregoing analysis, it is the opinion of this trial judge that plaintiffs' appellant issues are without merit and that no mistake of facts, errors of law, or abuse of discretion occurred at trial or in denying plaintiffs' post-trial motion request which would warrant granting a new trial. Accordingly, this trial judge respectfully recommends that the appeal be dismissed; and that this trial judge's order of May 24, 2010, and the jury verdict be affirmed.